OUTOKUMPU COPPER ROLLED
PRODUCTS AB and Outokumpu
Copper (USA) Inc., Plaintiffs,

v.

UNITED STATES of America,
et al., Defendants,

and

Hussey Copper, Ltd., et al.,
Defendant–Intervenors.

No. 92–02–00108.

United States Court of
International Trade.

Aug. 12, 1993.

Winthrop, Stimson, Putnam & Roberts, Thomas V. Vakerics, Mark A. Monborne, and David S. Christy, Jr., Washington, DC, for plaintiffs Outokumpu Copper Rolled Products AB and Outokumpu Copper (USA) Inc.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Department of Justice, A. David Lafer and Marc E. Montalbine, Linda S. Chang, Of Counsel, Attorney–Advisor, Office of the Chief Counsel for Import

Admin., U.S. Dept. of Commerce, Washington, DC, for defendants.

Collier, Shannon, Rill & Scott, David A. Hartquist, Jeffrey S. Beckington, Kathleen Weaver Cannon, and Mary T. Staley, Washington, DC, for defendant-intervenors.

## MEMORANDUM OPINION

GOLDBERG, Judge:

This action comes before the court on plaintiffs' and defendant-intervenors' motions for judgment upon the agency record and for remand. The parties challenge the final results of the second and third administrative reviews by the United States Department of Commerce, International Trade Administration ("Commerce"), issued jointly in *Brass Sheet and Strip from Sweden*, 57 Fed.Reg. 2706 (Dep't Comm.1992) (final admin. reviews). The court sustains Commerce's determination in part. The court also finds that Commerce's determination, in part, was not based upon substantial evidence or in accordance with law, and grants those relevant portions of plaintiffs' and defendant-intervenors' motions for judgment upon the agency record and requests for remand.

## BACKGROUND

On March 10, 1986, certain defendant-intervenors in this action [1] and others filed an antidumping duty petition with Commerce alleging sales of brass sheet and strip from Sweden at less than fair value. On January 9, 1987, Commerce issued its final determination of sales at less than fair value regarding brass sheet and strip from Sweden, and found a dumping margin of 9.49 percent by plaintiff Outokumpu Copper Rolled Products AB ("Outokumpu AB") [2]. *See Brass Sheet and Strip from Sweden*, 52 Fed.Reg. 819 (Dep't Comm.1987) (final determination). On March 6, 1987, Commerce entered its antidumping duty order. *See Brass Sheet and Strip from Sweden*, 52 Fed.Reg. 6998 (Dep't Comm.1987) (antidumping duty order).

Commerce next issued the final results of its first administrative review of the antidumping order, which encompassed the period of August 22, 1986 through February 29, 1988. *See Brass Sheet and Strip from Sweden*, 55 Fed.Reg. 49,317 (1990), as amended 56 Fed.Reg. 21,178 (1991). Subsequently, on March 1, 1989 and March 30, 1990, Outokumpu AB requested that Commerce conduct administrative reviews for the periods of March 1, 1988 through February 28, 1989, and from March 1, 1989 through February 28, 1990. Commerce's final results of these second and third reviews are the subject of this consolidated action.

After initiation of the second and third reviews, Commerce forwarded questionnaires to Outokumpu AB concerning numerous issues raised in both the second and third administrative reviews. Plaintiffs submitted responses in July, 1989 and July, 1990. Commerce then forwarded to plaintiffs numerous supplemental questionnaires and requests for information seeking additional information, to which plaintiffs provided several responses.

Commerce next published a joint preliminary determination in both the second and third administrative reviews on June 28, 1991. *See Brass Sheet and Strip from Sweden*, 56 Fed.Reg. 29619 (Dep't Comm.1991) (prelim. admin. reviews). Subsequently, a joint public hearing was conducted by Commerce regarding both reviews on August 12, 1991. All parties filed pre-hearing briefs.

Commerce then issued its joint final results of the second and third reviews in *Brass Sheet and Strip from Sweden*, 57 Fed.

---

**1.** Defendant-intervenors in this action, Hussey Copper, Ltd., the Miller Company, Olin Corporation–Brass Group, Revere Copper Products, Inc., International Association of Machinists and Aerospace Workers, International Union, Allied Industrial Workers of American, Mechanics Educational Society of America (Local 56), and United Steelworkers of America, are either domestic manufacturers of brass sheet and strip, or are domestic unions representing workers who manufacture similar domestic merchandise.

**2.** At the time of the original investigation, Outokumpu AB was known as Metallverken AB.

The second plaintiff in this action is Outokumpu Copper (USA) Inc. ("Outokumpu USA"). Outokumpu AB and Outokumpu USA are related parties because both are wholly-owned subsidiaries of Outokumpu Copper Oy.

Reg. 2706 (Dep't Comm.1992) (final admin. reviews). In it, Commerce found that in certain sales of the subject merchandise, plaintiff Outokumpu AB sold merchandise directly to unrelated United States purchasers. In other closed consignment sales to unrelated United States purchasers, Outokumpu USA acted as the importer of record and selling agent in the United States for Outokumpu AB. Further, during the period of investigation, Outokumpu USA also received commission-like payments from Outokumpu AB, which Commerce classified as indirect selling expenses.

Commerce additionally found that while Outokumpu USA posted cash deposits in the amount of antidumping duties for United States sales of the merchandise, Outokumpu AB did not absorb any duties on behalf of an importer. Commerce also determined that in some transactions, Outokumpu AB paid freight charges for transportation of the merchandise from Sweden to the first United States destination. In other sales, Outokumpu AB paid freight costs for transportation from Sweden to a warehouse and on to the unrelated United States purchaser.

Finally, in calculating United States price for sales of the merchandise, Commerce utilized purchase price for certain sales while using exporter sales price for others.

Plaintiffs then filed two complaints with this court, the first challenging the second administrative results in *Outokumpu Copper Rolled Products AB v. United States of America,* Court No. 92–02–00108, and the other challenging the third review in *Outokumpu Copper Rolled Products AB v. United States of America,* Court No. 92–02–00109. Defendant-intervenors' motions to intervene as defendants in these cases were granted. Defendant-intervenors also objected to several aspects of the administrative reviews results, and filed with this court *Hussey Copper Ltd. v. United States,* Court No. 92–02–00110 concerning the second review, and *Hussey Copper Ltd. v. United States,* Court No. 92–02–00111 regarding the third review. Plaintiffs' motions to intervene as defendants in these actions were also granted. The court consolidated the actions under *Outokumpu Copper Rolled Products*

*AB v. United States of America,* Consolidated Court No. 92–02–00108, on June 12, 1992.

Plaintiffs challenge only one aspect of Commerce's determination. They object to Commerce's reduction in the United States price for freight charges allegedly absorbed by Outokumpu AB, and its use of BIA to determine the amount of these freight costs.

Defendant-intervenors object to several aspects of Commerce's final results for its second and third reviews. First, they assert that Commerce failed to use best information available ("BIA") when calculating foreign market value. Defendant-intervenors also claim that Commerce incorrectly matched United States sales with foreign market sales, and that Commerce should have classified certain consignment sales as exporter's sales price rather than as purchase price transactions when calculating United States price. Defendant-intervenors additionally object to Commerce's determination that commissions paid by Outokumpu AB to Outokumpu USA were indirect selling expenses. Further, defendant-intervenors argue that Commerce incorrectly failed to reduce United States price in the amount of the antidumping duties which Outokumpu AB "absorbed or reimbursed" for its unrelated customers in the United States.

Finally, defendant-intervenors assert that Commerce made several computer programming errors that require correction. With limited exceptions, plaintiffs and defendants agree with defendant-intervenors in this regard. As a result, the court remands the action to Commerce for correction of all but one of these errors, and defendant-intervenors withdraw their challenge to the remaining aspect of Commerce's computer program concerning home market sales in the data base for the third review period.

### DISCUSSION

### A. Standard of Review

An antidumping determination will be overturned only if it is not supported by substantial evidence on the record or otherwise not in accordance with law. 19 U.S.C. 1516a(b)(1)(B) (1988). "Substantial evidence is more than a mere scintilla. It means such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *N.A.R., S.p.A. v. United States*, 14 CIT 409, 412, 741 F.Supp. 936 (1990) (quoting *Gold Star Co. v. United States*, 12 CIT 707, 708– 709, 692 F.Supp. 1382 (1988) *aff'd sub nom. Samsung Elecs. Co. v. United States*, 7 Fed. Cir. (T) 91, 873 F.2d 1427 (1989)).

■ Commerce is given "considerable deference in its interpretation of its statutory authority and the methodology employed in the administration of the antidumping law." *Tehnoimportexport v. United States*, 15 CIT 250, 253, 766 F.Supp. 1169 (1991) (citations omitted). Commerce's determination will not be overturned merely because the plaintiff can produce evidence in support of its own contentions and in opposition to the evidence supporting the agency's determination. *Id.*

## B.  Adjustments  for  Difference-in-Merchandise

■ The court will address defendant-intervenors' objections first. Defendant-intervenors argue first that Commerce failed to use BIA when calculating an aspect of foreign market value.

Title 19 United States Code, Section 1677b(a)(1)(A) (1988) provides that foreign market value of imported merchandise shall be the price, at the time such merchandise is first sold within the United States, at which such or similar merchandise is sold for home consumption. "Such or similar" merchandise is defined in 19 U.S.C. § 1677(16) (1988) as:

... merchandise in the first of the following categories in respect of which a determination for the purposes of part II of this subtitle can be satisfactorily made:

(A) The merchandise which is the subject of an investigation and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.

(B) Merchandise—

(i) produced in the same country and by the same person as the merchandise which is the subject of the investigation,

(ii) like that merchandise in component material or materials and in the purposes for which used, and

(iii) approximately equal in commercial value to that merchandise.

(C) Merchandise—

(i) produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation,

(ii) like that merchandise in the purposes for which used, and

(iii) which the administering authority determines may reasonably be compared with that merchandise.

Title 19 United States Code, Section 1677b(a)(4) mandates that:

In determining foreign market value, if it is established to the satisfaction of [Commerce] that the amount of any difference between the United States price and the foreign market value ... is wholly or partly due to—

.       .       .       .       .

(C) the fact that merchandise described in paragraph (B) or (C) of section 1677(16) of this title is used in determining foreign market value,

*then due allowance shall be made therefor.* 19 U.S.C. § 1677b(a)(4) (1988) (emphasis added).

The parties agree on the underlying facts in the instant action. In connection with the 1988–1989 and 1989–1990 administrative reviews, Commerce forwarded Questionnaires to plaintiffs which noted that:

*Adjustments for Similar Merchandise.* If in your home market you do not sell merchandise that is identical in physical characteristics and use to that sold in the United States, identify the most similar types of merchandise that you sell domestically.... Identify all physical differences between the U.S. items and the most similar home market items selected for comparison and include any technical or other specifications used to identify the product. Indicate the cost difference attributable to each physical difference. *You should be aware that if we do not agree with your*

*preference for comparison, at a later date we will have to request information on cost differences for the items we select for comparison.*

Antidumping Questionnaire at B–4, 1988–1989 Public Reel at 37, 1989–1990 Public Reel at 24 (emphasis added).

In response, plaintiffs proposed several model matches between merchandise sold in the United States and in the home market. Plaintiffs included difference-in-merchandise data for their proposed comparisons only. (*See* Questionnaire Response of plaintiffs at 11–18, 1988–1989 Confidential Reel at 20–27; Questionnaire Response of plaintiffs at 18–19, 1989–1990 Confidential Reel at 28–29.)

Commerce eventually used product comparisons different from those submitted by plaintiffs. Although Commerce used different product matches, Commerce never requested further information "on cost differences for the items [it] select[ed] for comparison." Antidumping Questionnaire at B–4. Commerce just utilized the scarce difference-in-merchandise data available in plaintiffs' proposals that it could apply to the product comparisons it chose. Commerce simply noted in an internal memoranda that "[a]djustments were [only] made for physical differences where adequate data were provided." Final Results Memorandum to File at 2, 1988–1989 Public Reel at 871–2, 1989–1990 Public Reel at 808–809. Consequently, due to this lack of information, Commerce could not and did not make comprehensive difference-in-merchandise adjustments on the actual comparisons used.

Defendant-intervenors now contend that plaintiffs improperly failed to submit to Commerce adjustment data for the alternative model matches which Commerce chose. Defendant-intervenors argue plaintiffs should have known that Commerce would actually use these matches because they were utilized in the original investigation. Moreover, they contend that in the original investigation, plaintiffs similarly failed to provide difference-in-merchandise information and Commerce relied upon BIA. Here, they assert, because Commerce was without sufficient difference-in-merchandise information regarding the comparisons actually used, it

should have relied upon BIA for this information, rather than forgoing all difference-in-merchandise adjustments that could not be made from the information plaintiffs originally submitted.

It is long settled that Commerce may use BIA only where "a party or any other person *refuses or is unable to produce information requested* in a timely manner and in the form required, or otherwise significantly impedes an investigation...." 19 U.S.C. § 1677e(c) (1988) (emphasis added). Commerce's own regulations provide that it may use BIA when Commerce "[d]oes not receive a complete, accurate, and timely response to [its] request for factual information...." 19 C.F.R. § 355.37(a)(1) (1992).

■ Moreover, case law has affirmed that: [a]lthough [Commerce] may properly request additional supplemental information, if needed, to fully resolve the issue, section 1677e(b) clearly requires *noncompliance with an information request* before resort to the best information rule is justified, whether due to refusal or mere inability.... To avoid the threat of § 1677e(b), a submitter need only provide complete answers to the questions presented in an information request.

*Olympic Adhesives, Inc. v. United States,* 8 Fed.Cir. (T) 69, 79, 899 F.2d 1565 (1990) (citation omitted). *See also Daewoo Elecs. Co. v. United States,* 13 CIT 253, 266, 712 F.Supp. 931 (1989).

■ In the case at bar, it is uncontested that Commerce never requested difference-in-merchandise information concerning product matches Commerce eventually used. Because this information was not sought, plaintiffs neither refused nor were they unable to produce information requested in a timely manner and in the form required. In addition, plaintiffs did not otherwise significantly impede the investigation. *See* 19 U.S.C. § 1677e(c) (1988).

Defendant-intervenors' theory is also unpersuasive that nevertheless, BIA was appropriate because plaintiffs, apparently on their own initiative, should have submitted additional difference-in-merchandise information in the administrative reviews since they were

"already on notice from the original investigation as to the product comparisons the agency would use and the likely result if relevant cost adjustment data were not provided." Defendant-intervenors' Memorandum of Points and Authorities in Support of Motion for Judgment upon the Agency Record ("Defendant-intervenors' Memorandum") at 15 n. 3. It is well established that antidumping investigations and administrative reviews are wholly independent proceedings. *NSK Ltd. v. United States*, 16 CIT ——, 788 F.Supp. 1228, 1229 (1992). In the action at issue, Commerce's previous investigation did not create an abiding responsibility on plaintiffs to provide unrequested information in the administrative reviews.

Consequently, Commerce's determination not to rely upon BIA for difference-in-merchandise information was proper and in accordance with law, and this aspect of Commerce's final results is affirmed.

### C. Most Similar Home Market Sales

■ Defendant-intervenors' next argument is also based upon 19 U.S.C. § 1677b(a)(1)(A) (1988) which, as noted under Section B above, provides that foreign market value of imported merchandise shall be the price at which "such or similar merchandise" is sold in the home market.

Defendant-intervenors assert that Commerce did not choose the "most" similar home market sales pursuant to 19 U.S.C. § 1677b(a)(1)(A) (1988) when matching United States sales with foreign market sales. Specifically, defendant-intervenors argue that Commerce must choose the "most" similar products for comparison. In this case, Commerce established a hierarchy of model matching criteria based upon four general physical characteristics of the merchandise—class or form, alloy, gauge, and width. Where exact matches of merchandise on each of these four criteria or groupings were not available, Commerce eliminated criteria in reverse order of importance, i.e. width then gauge.

Defendant-intervenors claim that instead of eliminating the entire grouping altogether, Commerce should have compared products with the next most similar characteristics

within each criteria. For example, if products with an identical width could not be found, Commerce should have compared articles with the next most similar widths, and not merely ignored the width criterion altogether. Defendant-intervenors' Memorandum at 19.

"An accurate investigation requires that the merchandise used in the comparison be as similar as possible. Furthermore, ... there is a statutory preference for comparison of most similar, if not identical merchandise for the purpose of [foreign market value] calculations." *NTN Bearing Corp. v. United States*, 14 CIT 623, 633, 747 F.Supp. 726 (1990), citing *Timken Co. v. United States*, 10 CIT 86, 96, 630 F.Supp. 1327 (1986). However, the *NTN Bearing Corp. of America* court also noted that:

> Commerce has traditionally been granted broad discretion in the selection of methodology implemented to achieve its mandate. Hence, absent a showing of unreasonableness on the part of the agency, its choice of methodology shall be sustained. Moreover, it is [Commerce] rather than an interested party that should make the determination as to what methodology should be used.

*NTN Bearing Corp. of America v. United States*, 14 CIT at 633, 747 F.Supp. 726 (citations omitted).

The question before the court, therefore, is whether Commerce's elimination of certain matching criteria where comparison models were not identical was reasonable and supported by substantial evidence. In its final results, Commerce supported its determination with the simple statement that:

> The model match method the Department used for these reviews is consistent with the one used for the original investigation and for the first review. Neither respondent nor petitioners raised any objection to the model match until after the Department issued its preliminary results. Additionally, petitioners have not provided any compelling reasons why the Department should now change its model match method for these reviews.

*Brass Sheet and Strip from Sweden,* 57 Fed. Reg. at 2708.

■ It is long settled law that a court may uphold a determination by Commerce "of less than ideal clarity if the agency's path may be reasonably discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974). However, the determination must still "disclose the basis of its order" and "give clear indication that it has exercised the discretion with which Congress has empowered it." *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962) (quoting *Phelps Dodge Corp. v. Labor Board,* 313 U.S. 177, 197, 61 S.Ct. 845, 854, 85 L.Ed. 1271 (1941)). An agency "must make findings that support its decision, and those findings must be supported by substantial evidence." *Burlington Truck Lines, Inc.,* 371 U.S. at 168, 83 S.Ct. at 245. Further, the agency must articulate a rational connection between the facts found and the choice made. *Id.*

In the case at bar, Commerce failed to provide sufficient justification for its decision to eliminate matching criteria altogether where exact matches of merchandise on all groupings were not available. Due to the brevity of Commerce's explanation, the court cannot ascertain the reasons supporting Commerce's decision to exclude groupings, and whether those grounds were reasonable. For example, the court is prevented from evaluating whether Commerce appropriately excluded other methodologies because of their complexity or unmanageability.

Therefore, the court remands the determination to Commerce with instructions upon remand to provide an explanation of its decision to eliminate model matching criteria where exact matches were unavailable, as well as its determination not to utilize defendant-intervenors' proposed methodology of retaining each criteria and comparing products with the next most similar characteristics within each grouping if an exact match is unavailable.

**D. Use of Purchase Price as United States Price**

■ In their next challenge, defendant-intervenors assert that when calculating United States price, Commerce should have classified certain consignment sales as exporter's sales price, rather than as purchase price, transactions. Title 19 United States Code, Section 1677a (1988) defines United States price as either the purchase price or exporter's sales price of the merchandise at issue. Purchase price is specifically described under 19 U.S.C. 1677a(b) (1988) as:

> the price at which merchandise is purchased, or agreed to be purchased, prior to the date of importation, from a reseller or the manufacturer or producer of the merchandise for exportation to the United States.

Alternatively, 19 U.S.C. 1677a(c) (1988) defines exporter sales price as "the price at which merchandise is sold or agreed to be sold in the United States, before or after the time of importation, by or for the account of the exporter. . . ."

Commerce has a longstanding practice of using purchase price as the United States price when domestic sales of the merchandise in question were made through related United States selling agents providing three qualifications are met. *See e.g. Steel Wheels from Brazil,* 54 Fed.Reg. 21456 (Dep't Comm.1989) (final determination); *Polyethylene Terephthalate Film, Sheet and Strip from Japan,* 56 Fed.Reg. 16300 (Dep't Comm.1991) (final determination); *Borusan Holding A.S. v. United States,* No. 92–57, 1992 WL 82493 (CIT Apr. 23, 1992).

In these actions, the manufacturer must ship the merchandise directly to the unrelated buyer, without introducing it into the related selling agent's inventory. This procedure must be the customary sales channel between the parties. The related selling agent located in the United States must act only as a processor of documentation and a communications link with the unrelated buyer.[3] If these three conditions are met, Com-

---

**3.** *See e.g. Polyethylene Terephthalate Film, Sheet, and Strip from Japan* 56 Fed.Reg. 16300, 16301

(Dep't Comm.1991) (final determination) which provides:

merce bases the purchase price on the price paid by the unrelated purchaser in the United States. *See e.g. Borusan Holding A.S. v. United States,* No. 92–57, 1992 WL 82493 (CIT Apr. 23, 1992).

Commerce determined that the transactions at bar involved closed-consignment sales made pursuant to a detailed, long-term contract between Outokumpu AB and a single unrelated purchaser in the United States. Outokumpu USA facilitated the sales from within the United States. Commerce found that Outokumpu AB shipped the merchandise directly to the unrelated buyer with no evidence that the products entered Outokumpu USA's inventory. Further, this pattern was Outokumpu AB's traditional commercial channel for these sales, and Outokumpu USA acted only as a processor of information. Consequently, the sales were properly classified as purchase price transactions.

Defendant-intervenors challenge the sufficiency of the evidence supporting three aspects of Commerce's conclusions. Specifically, defendant-intervenors claim that Outokumpu AB did not ship the merchandise directly to an independent buyer. Instead, they argue that the evidence showed the products were first shipped to independent warehouses, whose costs were borne by Outokumpu USA. Secondly, they assert, that in all its transactions up until the second and third administrative reviews, Outokumpu AB transported its merchandise directly to a warehouse owned by Outokumpu AB. Therefore, the pattern of sales was not the customary commercial channel for Outokumpu AB's sales.

Finally, they claim, Outokumpu USA was not simply a processor of sales related information. It acted as the importer of record, paid estimated antidumping duties on the merchandise, retained title prior to sale to the unrelated third party, and received commissions for its role in the transactions.

1. The merchandise in question was shipped directly from the manufacturer to the unrelated buyer, without being introduced into the physical inventory of the related selling agent;
2. This channel was the customary commercial channel for sales of this merchandise between the parties involved; and

█ The court notes from the outset that the possibility of drawing two inconsistent conclusions from the evidence does not prevent the agency's finding from being supported by substantial evidence. *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). The court will affirm the determination of Commerce when it is reasonable and supported by the record as a whole, even where there is evidence which detracts from the substantiality of the evidence. *Atlantic Sugar, Ltd. v. United States,* 2 Fed.Cir. (T) 130, 136, 744 F.2d 1556 (1984).

The issue before the court, therefore, is whether Commerce properly determined that the consignment sales met each purchase price criteria. The evidence shows that a long-term contract existed between Outokumpu AB and the unrelated United States customer covering all of the transactions at issue. Pursuant to contract terms, the customer placed a "call off" with Outokumpu AB through Outokumpu USA for a specified amount of merchandise. Outokumpu AB manufactured the products and shipped them directly to the purchaser or an independent warehouse. Although Outokumpu USA accepted title to the merchandise and paid some warehousing costs, warehoused merchandise was released upon the customer's request on a "just-in-time" basis.

The court notes that the evidence in this action closely parallels that in *Steel Wheels from Brazil,* 54 Fed.Reg. 21456 (Dep't Comm.1989) (final determination), where Commerce used purchase price to calculate United States price. Commerce noted that the merchandise was purchased or agreed to be purchased prior to importation, the selling agent acted only as a processor of sales, the products sold were:

> made-to-order and not sold through inventory. Although a party related to the seller took title to the wheels and held them in its warehouse after the sale was made, this

3. The related selling agent located in the United States acted only as a processor of sales-related documentation and a communication link with the unrelated U.S. buyer.

was only to accommodate the "just-in-time" delivery terms stipulated in the requirements contract negotiated between the Brazilian producer and the U.S. ... purchaser. All terms of the sale were settled in this contract and were not changed by the related party when it released the wheels to the U.S. ... purchaser.

[And] [w]arehousing for "just-in-time" delivery was the customary channel of trade for wheels sold [to the U.S.] purchaser. *Id.* at 21457. *See also Polyethylene Terephthalate Film, Sheet and Strip from Japan,* 56 Fed.Reg. 16300 (Dep't Comm.1991) (final determination).

Similarly, in the case at bar, the evidence showed that Outokumpu USA performed only ministerial functions. It accepted title to the products and paid warehousing costs simply to accommodate the 'just-in-time' delivery terms stipulated in the contract. All terms of the sale were contractually settled, and remained unchanged by Outokumpu USA when it released the merchandise. Moreover, the existence of the contract confirms Commerce's finding that this procedure was Outokumpu AB's traditional commercial channel with this customer.

Further, the facts at bar differ significantly from those in *New Minivans from Japan,* 57 Fed.Reg. 21937 (Dep't Comm.1992) (final determination), where Commerce relied upon exporter's sales price. In that action, Commerce based its determination upon "all of [the] circumstances," including evidence that the related United States selling agent was fully responsible for marketing the product. *Id.* at 21,945. The agent helped formulate marketing strategies with an advertising agency, and bore all advertising and marketing costs. While, as in the instant case, the agent in *New Minivans from Japan* took title to the merchandise, it also actively processed warranty claims.

Clearly, here, Outokumpu USA did not participate in sales and post sale activity to the extensive degree as did the selling agent in *New Minivans from Japan.* The court finds, therefore, that sufficient evidence supported Commerce's decision to use purchase price as the United States price in the trans-

actions at bar. Commerce's final results are affirmed in this regard.

## E. Adjustment of U.S. Price for Indirect Selling Expenses

In Commerce's calculation of United States price, defendant-intervenors object to Commerce's determination that commissions paid by Outokumpu AB to Outokumpu USA, its related sales agent in the United States, were indirect selling expenses. Defendant-intervenors assert that not only did Commerce fail to place the burden upon plaintiffs of showing that these expenses were indirect, but plaintiffs did not demonstrate that the expenses were in fact indirect.

The facts regarding this issue are complex. For certain United States sales, Outokumpu AB incurred expenses, similar to commissions, which were paid to Outokumpu USA in the United States. In its preliminary determination of United States price, Commerce expressly stated it made deductions for commissions when calculating exporter's sales prices only. *Brass Sheet and Strip from Sweden,* 56 Fed.Reg. 29619 (Dep't Comm. 1991) (prelim. admin. reviews). In connection with its calculation of foreign market value, Commerce stated that:

[s]ince there were no commissions paid in the home market during the March 1, 1988 through February 28, 1989 period, for purchase price transactions, we deducted home-market indirect selling expenses from [foreign market value] to offset U.S. commissions. *See* 19 CFR 353.56(b)(1).

No indirect selling expenses were provided for the period March 1, 1989 through February 28, 1990 for both purchase price and exporter's sales price transactions. For purchase price transactions, we added the U.S. commissions to [foreign market value] and did not offset [foreign market value] for these indirect expenses. *See* 19 CFR 353.56(b)(1); *See* 19 CFR 353.-56(b)(2).

*Brass Sheet and Strip from Sweden,* 56 Fed. Reg. 29619 (Dep't Comm.1991) (prelim. admin. reviews).

Subsequently, plaintiffs filed their prehearing brief in which they objected to Com-

merce's decision to adjust United States price for commissions paid to Outokumpu USA by Outokumpu AB. Plaintiffs argued that adjustment was improper because the commissions were merely intracorporate transfers, and not directly related, arm's length transactions.

In Comment One of Commerce's final results, Commerce addressed plaintiffs' challenge to its preliminary decision to adjust for commissions paid to Outokumpu USA. Commerce explained that:

> [t]he Court of Appeals remand in *LMI–La Metalli Industriale S.p.A. v. United States,* 912 F.2d 455 (1990), instructed the Department to adjust for commissions paid to a related party in the home market when the commissions were determined to be (1) at arm's length and (2) directly related to the sales in question. Subsequent to this, the Department has developed the following guidelines to determine whether commissions paid to related parties either in the United States or in the foreign market are at arm's length....

*Brass Sheet and Strip from Sweden,* 57 Fed. Reg. at 2707.

Commerce then specified that it compared similarities and differences between commissions paid to related selling agents with those paid to unrelated selling agents, or where no unrelated sales agent existed, it compared commissions to those paid to related sales agents on sales of merchandise produced by other unrelated entities to determine if they were at arms length. *Id.* at 2707. Commerce continued that "[i]f, based on the above analysis, the Department is satisfied that the commissions are at arm's length as well as directly related to the sales, we will make an adjustment for these commissions." *Id.* at 2707. Commerce next found that while evidence showed that the commissions in this case were directly related to the sales, sufficient evidence was not presented to demonstrate the arm's length nature of the commissions. Commerce concluded that therefore no direct commission adjustments were appropriate. However, where commission expenses were not at arm's length, Commerce treated "such payments to related parties as indirect selling expenses," and de-

ducted these costs from exporter's sales price calculations *Id.* at 2707.

It is this decision to treat these costs as indirect selling expenses which defendant-intervenors challenge. Specifically, defendant-intervenors argue that should Commerce have found the commission expenses were both directly related and arms length costs, the resulting adjustment would increase plaintiffs' dumping margin.

Alternatively, defendant-intervenors contend, if the commissions were found not to meet both of these tests, the expenses would not be considered direct selling expenses. Rather, they are treated, as they were in this case, as indirect selling expenses. In cases of this nature, Commerce *only* deducts these amounts from *exporter's sales price* calculations, and *not* from *purchase price* determinations. Since the majority of plaintiffs' sales at issue were treated by Commerce as purchase price transactions, the United States price for most of plaintiffs' sales would not be reduced, and the dumping margin would not be increased. Defendant-intervenors argue that, therefore, plaintiffs' interests are best served if the commissions incurred in the United States are treated as indirect selling expenses.

Defendant-intervenors conclude that Commerce labelled the commissions indirect selling expenses by default simply because plaintiffs failed to prove they were direct arm's length commission expenses—a showing against their interests. Accordingly, Commerce failed to place the burden on plaintiffs of showing that the expenses were indirect.

The court must therefore determine whether Commerce improperly freed plaintiffs from their burden of proof, and whether sufficient evidence supported Commerce's determination that the expenses were indirect. In order to accomplish these tasks, the court must identify the precise adjustments for commission expenses which Commerce made to United States price and foreign market value, and the statutory provisions supporting that treatment. After an exhaustive review of the record, the court cannot ascertain the exact adjustments for commissions which Commerce made in the prelimi-

nary review results to exporter's sales price, purchase price, and foreign market value calculations. The court also cannot identify the precise statutory or regulatory provisions relied upon by Commerce in its preliminary review results. Likewise, in regard to Commerce's final review results, the court is unable to conclusively determine the precise provisions supporting Commerce's finding that the payments were indirect expenses properly deducted from exporter's sales price calculations.

Because the court cannot discern from the record the facts supporting Commerce's adjustments, the court is unable to make a determination on this issue at this time. The court remands this portion of Commerce's final review results to Commerce. Upon remand, Commerce is directed to explicitly identify, for both the preliminary and final review results, all adjustments for commission-related expenses made to United States price and foreign market value, as well as the specific supporting statutory and regulatory provisions.

## F. Reimbursement of Antidumping Duties

■ Defendant-intervenors next assert that Commerce incorrectly failed to reduce United States price in the amount of the antidumping duties which Outokumpu AB "absorbed or reimbursed" for certain sales to its unrelated customers in the United States. Defendant-intervenors Memorandum at 40.

The relevant Code of Federal Regulations directives provide as follows:

### § 353.26 Reimbursement of antidumping duties.

(a) *In general.* (1) In calculating the United States price, the Secretary will deduct the amount of any antidumping duty which the producer or reseller:

(i) Paid directly on behalf of the importer; or

(ii) Reimbursed to the importer.

19 C.F.R. § 353.26 (1992).

### § 353.2 Definitions

(i) *Importer.* Importer means the person by whom, or for whose account, the merchandise is imported.

.    .    .    .    .

(r) *Producer; production.* Producer means a manufacturer or producer. *Production* means manufacture or production.

(s) *Reseller.* Reseller means any person (other than the producer) whose sales the Secretary uses to calculate foreign market value or U.S. price, including the foreign reseller or exporter.

19 C.F.R. § 353.2 (1992).

The record shows that Outokumpu USA was the importer of record for the merchandise at issue which was produced by Outokumpu AB. Upon entry into the United States, Outokumpu USA complied with its statutory obligation and posted cash deposits in the amount of estimated antidumping duties.

As they did in the proceedings below, defendant-intervenors now argue that the fundamental precept of antidumping duty law is to raise the importer's purchase price to an amount equal to the foreign producer's home price. However, where the foreign producer, rather than the true United States importer, pays the duty, the economic pressure on the importer is lifted, and the importer can sell the imports in the United States at a price uninfluenced by the duty. Defendant-intervenors Memorandum at 45.

Defendant-intervenors concede that Outokumpu USA posted cash deposits on all subject imports. However, defendant-intervenors argue that these deposits were payment of duties, and financial statements show that these *duties* were reflected on Outokumpu AB's annual report, which is a consolidated statement that includes Outokumpu USA's expenses as Outokumpu AB's expenses. Accordingly, they claim, the court should treat Outokumpu AB and Outokumpu USA as a single entity, and conclude that "payment of antidumping duties by [Outokumpu] USA is tantamount to payment by [Outokumpu] AB and hence adjustable reimbursement." Defendant-intervenors' Memorandum at 49.

Defendant-intervenors hold that, moreover, other evidence supports their reason-

ing. For example, in regard to purchase price sales, Outokumpu AB and Outokumpu USA should be collapsed together because, as discussed previously in Section D of this opinion, Commerce considered them a single company for those sales and used Outokumpu USA's price to the first unrelated purchaser as the United States price. Further, as discussed previously in Section E of this opinion, Commerce determined that both companies were in reality a single entity because commissions paid to Outokumpu USA were treated not as arm's length transactions, but as "intracompany" transfers. In order to remain consistent, Commerce must here again view Outokumpu AB and Outokumpu USA as a single unit.

With respect to exporter's sale price sales, defendant-intervenors also contend that evidence shows Outokumpu AB and Outokumpu USA should be collapsed. Defendant-intervenors assert that Outokumpu USA qualified as a reseller (pursuant to 19 C.F.R. § 353.2 (1992) and 19 C.F.R. § 353.26 (1992)), and the unrelated United States purchasers should be considered the "importers-in-fact." Since Outokumpu USA, as a reseller, paid antidumping duties directly for these "importers-in-fact," the United States price should correspondingly be adjusted.

Commerce's views on defendant-intervenors' contentions are clear. In Comment Eight of its final results, Commerce examined, then rejected defendant-intervenors' argument, and stated that the regulations hold that:

> in calculating the U.S. price, the Department will deduct any amount of antidumping duties that are reimbursed to the importer by the producer or reseller. There is no evidence on the record that [Outokumpu] AB pays any antidumping duties directly for [Outokumpu] USA or reimburses [Outokumpu] USA for such duties. Absent evidence of reimbursement, the Department has no authority to make such an adjustment to U.S. price.

*Brass Sheet and Strip from Sweden,* 57 Fed. Reg. at 2708.

The court finds that Commerce acted well within its discretion in rejecting defendant-intervenors' arguments. As an initial matter,

the court emphasizes that 19 C.F.R. § 353.26 (1992) permits adjustment to United States price *only* where the producer or reseller *paid duties on behalf of the importer* or *reimbursed the importer.* Not only do defendant-intervenors not claim that Outokumpu AB paid duties on behalf of Outokumpu USA or reimbursed Outokumpu USA, but the court can find no evidence on the record suggesting that Outokumpu AB did.

Instead, defendant-intervenors' position is based solely on the extraordinary theory that the court should overlook past administrative practice, determine that Outokumpu AB and Outokumpu USA are properly collapsed together, that ultimate United States purchasers are actually importers, and conclude that Outokumpu AB/Outokumpu USA reimbursed or paid duties directly on behalf of "importers-in-fact."

Most importantly, the court notes again that Commerce is given considerable deference in interpreting its statutory authority, and in the choice of methodology it utilizes. *Tehnoimportexport v. United States,* 15 CIT 250, 253, 766 F.Supp. 1169 (1991) (citations omitted).

Further, Commerce previously discarded defendant-intervenors' precise contentions in *Brass Sheet and Strip from the Republic of Korea,* 54 Fed.Reg. 33,257 (Dep't Comm. 1989) (final admin. review). In that action, petitioners had argued that Commerce should deduct from the United States price the amount of the antidumping duties to be paid by the respondent's United States affiliate who was the importer of record, because it will "achieve the price equilibrium intended by" the regulations. *Id.* at 33257. Commerce did not collapse the respondent and its United States affiliate. Instead, it treated them as separate entities, and found that it had no authority to make such an adjustment because petitioners had "not alleged that antidumping duties are being reimbursed [to the United States affiliate], and there is no evidence on the record that an agreement to reimburse those duties exists." *Id.*

Here, defendant-intervenors are unable to distinguish the present case from *Brass Sheet and Strip from the Republic of Korea*

by demonstrating, for example, that Outokumpu AB's and Outokumpu USA's identities were so intermingled so as to necessitate treatment as a single entity. Defendant-intervenors could only point to the slender reed of evidence that Outokumpu USA's expenses were listed under Outokumpu AB's on a general corporate report. However, not only did uncontested evidence establish that Outokumpu AB and Outokumpu USA were distinct, wholly-owned subsidiaries of Outokumpu Copper Oy, no evidence affirmatively demonstrated any improper financial intermingling between the companies.

Likewise, defendant-intervenors' citations to joint sales activity which supported Commerce's use of purchase price for United States price, or to the commission-like transfers of funds between Outokumpu AB and Outokumpu USA were also insufficient to require the court to view them as one entity. Neither Outokumpu USA's actions in *certain sales* as a document processor or communications link with Outokumpu AB nor Outokumpu USA's receipt of non-arm's length commission-like payments reveal any improper disregard of Outokumpu AB and Outokumpu USA's separate corporate identities or any inappropriate financial intermingling.

Moreover, even assuming Outokumpu AB and Outokumpu USA had intermingled identities, defendant-intervenors were unable to point to statutory or case law, or administrative practice which permits the court to transform the ultimate United States purchasers into importers[4], or which allows the court to recast cash deposits made by Outokumpu USA into duties actually paid. Similarly, defendant-intervenors cannot point to evidence showing that Outokumpu AB *OR* Outokumpu USA *reimbursed* any party, or paid duties *directly* on an importer's behalf.

The court determines, therefore, that Commerce properly refused to reduce United States price because neither Outokumpu AB nor Outokumpu USA paid duties on behalf of an importer, or reimbursed an importer for duties. Commerce's final results are accordingly sustained in this respect.

---

4. The court likewise was unable to locate such authority, and existing sources held to the contrary. *See A.N. Deringer, Inc. v. Consolidated*

### G. Computer Programming Errors

All parties agree that a remand is appropriate in order that several computer programming errors made by Commerce may be corrected. Specifically, upon remand Commerce is instructed to fairly recalculate difference-in-merchandise adjustments to relate to contemporaneous sales, and to recalculate differences in metal values by subtracting the full metal value costs for one alloy from the full metal value costs for another. Additionally, Commerce is directed to make fabrication cost difference-in-merchandise adjustments using the relevant data provided by plaintiffs, and to make adjustments for differences-in-merchandise where cost adjustment information was supplied for the third administrative review period.

Finally, because defendant-intervenors withdraw their challenge to Commerce's inclusion of certain home market sales in the data base for the third review period, the court need not address this issue.

### H. Use of Best Information Available for Freight Charges

■ In their only challenge to the final results, plaintiffs assert that Commerce improperly reduced United States price in the amount of freight charges allegedly incurred by Outokumpu AB in transportation of the subject merchandise between independent United States warehouses and purchasers in the United States. Plaintiffs claim that Commerce incorrectly determined that Outokumpu AB paid these freight charges, when in fact the unrelated United States purchasers did. Further, because Outokumpu AB did not pay these charges and, accordingly, no information existed regarding the amounts, Commerce erroneously relied upon BIA to determine the amount of the freight costs "paid" by Outokumpu AB.

Title 19 United States Code, Section 1677a(d)(2)(A) (1988) provides that United States price shall be reduced by:

*Computer Serv. Int'l, Inc.* 381 F.Supp. 1208 (D.Mass 1974).

the amount, if any, included in such price, attributable to any additional costs, charges, and expenses, and United States import duties, incident to bringing the merchandise from the place of shipment in the country of exportation to the place of delivery in the United States....

In order to ascertain the amount of freight charges incurred by plaintiffs, Commerce requested in questionnaires for both the second and third administrative reviews that Outokumpu AB list all relevant freight charges.

In response, plaintiffs noted that Outokumpu AB paid "freight and insurance on a point-to-point basis from Vasteras [Sweden] to the first U.S. destination." 1989–1989 Confidential Reel at 44, 1989–1990 Confidential Reel at 49.

However, Commerce subsequently forwarded to plaintiffs requests seeking information, in part, on closed consignment sales. In its responses to the requests, Outokumpu AB delivered a copy of a closed consignment sales agreement to Commerce, which included a letter of agreement ("Letter") between Outokumpu AB and an unrelated United States purchaser. The Letter noted that Outokumpu AB will "absorb freight charges for one delivery to [the purchaser] per week at a minimum of [a specified amount of] pounds." 1988–1989 Confidential Reel at 480.

Commerce asserts that "[f]rom the terms of this agreement it appeared that [Outokumpu] AB was responsible for paying the freight not only for delivery to the independent warehouse but also for delivery to the customer's premises." Defendant's Memorandum in Partial Opposition to Plaintiffs' Motions for Judgment upon the Agency Record at 9. As a result, Commerce issued a supplemental questionnaire in the second administrative review which stated:

3. Freight

a. Please explain whether [Outokumpu] AB, [Outokumpu] USA, or the unrelated third party purchasers paid the freight expenses for transferring the merchandise from independent warehouses to the unrelated third party purchasers. (Refer, for example, to [the Letter].)

b. Was any entity reimbursed for these warehousing expenses? If so, please explain.

c. If yes, please provide these expenses on a sale-by-sale basis.

1988–1989 Public Reel at 580.

In the third review, Commerce's questionnaire stated only that:

4. Freight

a. Please report whether [Outokumpu] AB, [Outokumpu] USA, or the unrelated third party purchasers paid the freight expenses for transferring the merchandise from independent warehouses to the unrelated third party purchasers.

b. Was any entity reimbursed for these warehousing expenses? If so, please explain.

c. If yes, please provide these expenses on a sale-by-sale basis.

1989–1990 Public Reel at 497.

Plaintiffs replied in response to Item 3a and Item 4a, respectively, of both questionnaires that "[t]he unrelated third party purchasers paid all freight expenses between the independent warehouses and their factories." 1988–1989 Confidential Reel at 1085; 1989–1990 Public Reel at 506. In reference to Items 3b, 3c, 4b and 4c, respectively, plaintiffs noted that "[n]o party was reimbursed for these expenses." 1988–1989 Confidential Reel at 1085; 1989–1990 Public Reel at 506.

Nevertheless, in its preliminary results, Commerce found that:

[f]or the one U.S. customer for which we had information that [Outokumpu] AB's U.S. subsidiary paid some of the freight costs from independent U.S. warehouses to the customer, but for which we had received no information on these freight costs, we used the reported ocean freight expenses as best information available (BIA).

*Brass Sheet and Strip from Sweden,* 56 Fed. Reg. at 29,619.

Subsequently, Commerce notified plaintiffs that its information that Outokumpu AB's United States subsidiary paid some of the freight costs was obtained from the Letter previously submitted by plaintiffs. 1988–

1989 Confidential Reel at 1096. Plaintiffs then informed Commerce in their pre-hearing briefs and at the hearing itself that Outokumpu AB did not pay freight charges because the United States purchaser did not insist that it honor the provisions of the Letter.

On January 23, 1992, Commerce issued its final results in which it found that:

> [t]he Department has received conflicting information from [Outokumpu] AB concerning which party eventually paid the freight charges for movement between the independent U.S. warehouse and the U.S. purchaser's warehouse. As an appendix to its original questionnaire response, respondent submitted copies of a letter that stated that respondent paid certain of these freight charges. In a supplemental questionnaire, the Department asked about these charges and specifically drew respondent's attention to that letter. In its response to the supplemental questionnaire, [Outokumpu] AB stated that the U.S. customer paid the freight and was not reimbursed by any party. However, [Outokumpu] AB did not address the contradictory information in the letter that it had supplied to the Department, despite the Department's specific request to do so. Not until after the Department issued its preliminary results did respondent address this specific issue. Therefore, the Department considers this additional information untimely, and deducted a freight charge from U.S. price, using for freight the BIA used in the preliminary results for these final results.

*Brass Sheet and Strip from Sweden,* 57 Fed.Reg. at 2707.

Plaintiffs now argue that Commerce's contention that it received conflicting information from Outokumpu AB concerning which party paid freight charges was erroneous. Plaintiffs claim they fully responded to the supplemental questionnaires, which were effectively yes or no inquiries. Further, Commerce did not expressly request a specific and narrow comment regarding the language in the Letter that Outokumpu AB would absorb freight charges. It simply asked plaintiffs to refer to the Letter, which plaintiffs did prior to preparing their response.

■ As previously discussed, BIA may be properly utilized only where a party refuses or is unable to timely produce information requested. 19 U.S.C. § 1677e(c) (1988). While Commerce is afforded wide discretion in the use of BIA, Commerce's discretion is not entirely unfettered. Courts have, for example, found Commerce's resort to BIA to be arbitrary and an abuse of discretion where the respondent failed to give information because the information did not and could not exist. *Olympic Adhesives, Inc. v. United States,* 8 Fed.Cir. (T) 69, 899 F.2d 1565 (1990). Commerce must also properly instruct the respondent as to the information requested. *See Daewoo Elecs. Co. v. United States,* 13 CIT 253, 266, 712 F.Supp. 931 (1989).

In the case at bar, Commerce's supplemental questionnaires simply sought an explanation of whether Outokumpu AB, Outokumpu USA, or unrelated purchasers paid freight expenses. Plaintiffs' reply that unrelated purchasers paid all freight expenses between independent warehouses and their factories was fully responsive to the inquiry. Plaintiffs' explanation explicitly informed Commerce that unrelated purchasers, to the exclusion of all other parties, paid all freight costs.

Commerce's argument in its final results is not convincing that its notation requesting plaintiffs to "[r]efer, for example" to the Letter was, in fact, an express instruction to plaintiffs to specifically explain the "conflicting" information on the record. Commerce's request only asked plaintiffs to refer *"for example"* to the Letter; it did not direct them to explicitly *discuss* the contents of the Letter.

Commerce's argument also inaccurately presumes that the "contradictory" evidence in the record was so obvious that the only reasonable purpose of the supplemental questionnaire was to resolve these "inconsistencies." However, the evidence in the record was neither contradictory nor obvious. The Letter only noted that Outokumpu AB "will" absorb freight charges; it did not definitively indicate that Outokumpu AB actual-

ly paid these costs. The fact that plaintiffs did not actually pay freight charges because payment was not demanded of them is manifestly not contradictory to a contract provision suggesting plaintiffs could be held liable for them. If Commerce desired an explanation of why Outokumpu AB contracted to absorb certain freight charges, but did not actually pay them, it should have expressly requested one.

The court finds that plaintiffs neither refused nor were unable to produce information requested by Commerce regarding "inconsistent" evidence of payment for freight expenses. Therefore, Commerce improperly relied upon BIA for the amount of freight charges. Accordingly, Commerce's final results are remanded with instructions upon remand to recalculate United States price without reduction for these freight charges.

## CONCLUSION

For the reasons provided above, this court holds that the final results of Commerce's second and third administrative reviews regarding sales of brass sheet and strip from Sweden were, in part, supported by substantial evidence and in accordance with law, and in part unsupported by substantial evidence and not in accordance with law. Accordingly, Commerce's final results are affirmed in part, the parties' motions for judgment on the agency record are denied in part, granted in part, and their motions for remand are also granted.

## JUDGMENT AND ORDER

These Motions for Judgment on the Agency Record and for Remand to the Department of Commerce, International Trade Administration, having been submitted for decision, and upon consideration of the briefs submitted and other papers, it is hereby:

**ORDERED** that plaintiffs' Motions for Judgment on the Agency Record and for Remand to the Department of Commerce are granted; and it is further

**ORDERED** that defendant-intervenors' Motions for Judgment on the Agency Record and for Remand are granted in part and denied in part; and it is further