**The AD HOC COMMITTEE OF AZ–NM–TX–FL PRODUCERS OF GRAY PORTLAND CEMENT and National Cement Company of California, Plaintiffs,**

v.

**The UNITED STATES, Defendant,**

and

**Cemex, S.A., Defendant–Intervenor.**

Slip Op. 94–151.
Court No. 93–05–00273.

United States Court of International Trade.

Sept. 26, 1994.

King & Spalding, Joseph W. Dorn, Michael P. Mabile, Gregory C. Dorris and Martin McNerney, Washington, DC, for plaintiffs.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Dir., Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Robert E. Kirschman, Jr., Terrence J. McCartin, Atty. Advisor, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, DC, of counsel, for defendant.

Manatt Phelps & Phillips, Irwin P. Altschuler, David R. Amerine, Ronald M. Wisla and Claudia G. Pasche, Washington, DC, for defendant-intervenor.

## OPINION

RESTANI, Judge:

This matter is before the court on cross-motions for judgment on the agency record pursuant to USCIT R. 56.2. Plaintiffs, the Ad Hoc Committee of AZ–NM–TX–FL Producers of Gray Portland Cement and National Cement Company of California (collectively "the Committee") and defendant-intervenor, CEMEX, S.A. ("CEMEX"), challenge the results of the first administrative review of the antidumping order in *Gray Portland Cement and Clinker from Mexico*, 58 Fed. Reg. 25,803 (Dep't Comm.1993) (final admin. review). The issues presented are whether pre-sale home market transportation costs should have been deducted in the calculation of foreign market value ("FMV"), whether the value-added tax ("VAT") adjustment was proper, whether best information available ("BIA") should have been applied to CEMEX, and whether the BIA rate chosen was proper.

### Background

On August 30, 1990, the International Trade Administration of the United States

Department of Commerce ("Commerce") issued an antidumping order covering entries of gray portland cement and clinker from Mexico. *Gray Portland Cement and Clinker from Mexico,* 55 Fed.Reg. 35,443 (Dep't Comm.1990) (antidumping duty order). A margin of 58.38 percent was applied to CEMEX. *Id.*

On September 18, 1991, Commerce initiated its first administrative review of the antidumping order, covering entries from April 12, 1990 through July 31, 1991. On March 6, 1992, the Committee filed a complaint with Commerce alleging that during the review period CEMEX created fictitious home market sales within the meaning of 19 U.S.C. §§ 1677b(a)(1), (5) (1988). *See* Pls.' Conf.App., App. B.

On April 28, 1993, Commerce issued the final determination of the first review, applying a revised dumping margin of 30.44 percent for CEMEX and reaching a negative determination on the fictitious market issue. 58 Fed.Reg. at 25,803–04, 25,810.[1] On May 13, 1993, CEMEX filed an action challenging the final determination. On May 19, 1994, the Committee filed a separate action challenging Commerce's final determination as to respondent CEMEX. These actions were consolidated on June 16, 1993.

On November 30, 1993, the Committee moved for judgment on the agency record pursuant to USCIT R. 56.2. *See* USCIT R. 56.2. On April 18, 1994, CEMEX cross-moved for judgment on the agency record.[2]

On the same date, CEMEX also moved to strike certain sections of the Committee's brief relating to the Committee's fictitious market argument.

The Committee had initially raised four arguments in its motion for judgment on the agency record: a/ CEMEX created a fictitious market; b/ Commerce erred in calculating CEMEX's cost of production by offsetting CEMEX's interest expense with a hypothetical monetary position gain; c/ Commerce erred in calculating FMV by deducting CEMEX's pre-sale home market transportation expenses; and d/ Commerce erred in adjusting for VAT by adding an absolute tax to the United States price ("USP").[3]

The Committee has withdrawn its fictitious market and monetary position gain arguments as a result of Commerce's second review, *Gray Portland Cement and Clinker from Mexico,* 58 Fed.Reg. 47,253, 47,255 (Dep't Comm.1993) (final) (excluding CEMEX's home market sales of Type II cement from calculation of FMV because outside ordinary course of trade), and the Federal Circuit's holding in *Ad Hoc Comm. of AZ–NM–TX–FL Producers of Gray Portland Cement v. United States,* 13 F.3d 398 (Fed.Cir.1994) (finding no inherent authority for ITA to deduct pre-sale home market transportation expenses from FMV).[4] Thus the remaining issues presented by the Committee are: a/ the limits on deduction of home market pre-sale transportation costs following *Ad Hoc,* and b/ VAT adjustment.[5]

---

1. After correction for clerical errors, the margin increased to 40.72 percent. *Gray Portland Cement and Clinker from Mexico,* 58 Fed.Reg. 49,471 (Dep't Comm.1993) (amended final admin. review).

2. CEMEX's brief is entitled "Memorandum in Support of Points Raised in [its] Complaint," but is properly considered a motion for judgment on the agency record.

3. USP, exporter's sales price ("ESP") and purchase price ("PP") are defined at 19 U.S.C. § 1677a (1988):

   **(a) United States price**
   ... [T]he term "United States price" means the purchase price, or the exporter's sales price, of the merchandise, whichever is appropriate.

   **(b) Purchase price**
   ... "[P]urchase price" means the price at which merchandise is purchased, or agreed to be purchased, prior to the date of importation, from a reseller or the manufacturer or producer of the merchandise for exportation to the United States.

   **(c) Exporter's sales price**
   ... "[E]xporter's sales price" means the price at which merchandise is sold or agreed to be sold in the United States, before or after the time of importation, by or for the account of the exporter ...."

4. As the fictitious market argument has been withdrawn, CEMEX's motion to strike is denied as moot.

5. All parties agree that the court should remand the case to Commerce for reconsideration of Commerce's treatment of CEMEX's pre-sale home market transportation costs and recalcula-

CEMEX raises two arguments in its motion for judgment on the agency record: a/ Commerce erred in applying adverse BIA to the reclassified ESP sales, and b/ Commerce improperly applied BIA in calculating added materials costs for further manufactured concrete products.

## Standard of Review

On a motion for judgment on the agency record, the scope of review of Commerce's determination is whether it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed.Cir.1984) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)).

## Discussion

A. *Deduction of Pre-sale Home Market Transportation Expenses*

As provided under 19 U.S.C. § 1677b(a)(4)(B),

[i]n determining [FMV], if it is established to the satisfaction of the administering authority that the amount of any difference between the [USP] and the [FMV] (or that the fact that the [USP] is the same as the [FMV]) is wholly or partly due to—

. . . .

(B) other differences in circumstances of sale; . . .

. . . .

then due allowance shall be made therefor. 19 U.S.C. § 1677b(a)(4)(B) (1988). Commerce's implementing regulation generally requires a direct relationship between the expenses and the particular sales at issue before FMV may be adjusted. 19 C.F.R.

§ 353.56(a) (1993). For ESP comparisons, a circumstances of sale ("COS") adjustment is permitted for indirect expenses. *Id.* § 353.56(b)(2); *see Consumer Prods. Div. v. Silver Reed America, Inc.*, 753 F.2d 1033, 1035–36 (Fed.Cir.1985).[6] The regulation also provides for an ESP offset cap that, for ESP comparison purposes, caps the COS adjustment for indirect expenses at the level of indirect expenses incurred in the United States market. 19 C.F.R. § 353.56(b)(2).

■ The court first considers the Committee's claim that Commerce improperly deducted pre-sale home market transportation expenses[7] in calculating FMV. The Committee argues that the Federal Circuit's holding in *Ad Hoc* precludes Commerce from deducting any pre-sale home market transportation costs in calculating FMV for PP or ESP comparisons. Commerce responds that a remand is required for it to conform its analysis to the holding of *Ad Hoc*, but also that *Ad Hoc* does not prohibit Commerce from invoking the COS provision contained in 19 U.S.C. § 1677b(a)(4) to deduct pre-sale home market transportation costs from FMV. CEMEX supports Commerce's view.

The Federal Circuit in *Ad Hoc* presented the issue on review as: "[W]hether the [FMV] provision of the antidumping statute, 19 U.S.C. § 1677b, authorizes a deduction from [FMV] of pre-sale transportation costs within the exporting country for goods sold within that country." *Ad Hoc*, 13 F.3d at 400. In *Ad Hoc*, Commerce had deducted pre-sale home market transportation costs from FMV in a purchase price ("PP") comparison pursuant to its "inherent authority" to fill "gaps" in the antidumping statute. *Id.* at 400–01. The Federal Circuit stated, "That Congress included a deduction for transportation costs from USP but not from FMV leads us to conclude that Congress did not

---

tion for VAT adjustment, but disagree as to the instructions for reconsideration. *See* Pls.' Reply Br.Supp.Mot.J. Agency R. at 2; Def.'s Mem. Opp'n Pls.' Mot.J. Agency R. at 16–17; Def.–Int.'s Mem. Opp'n Pls.' Mot.J. Agency R. at 21, 28.

**6.** *Silver Reed* discusses an earlier version of 19 C.F.R. § 353.56(b)(2). *See* 19 C.F.R. § 353.15(c) (1985).

**7.** During the first review period, CEMEX incurred certain freight expenses in shipping cement from its home plants to home market distribution terminals, where the cement was stored prior to sale.

intend pre-sale home-market transportation costs to be deducted from FMV." *Id.* at 402.

This is admittedly a broad statement, but recently in *Torrington Co. v. United States,* 850 F.Supp. 7 (Ct. Int'l Trade 1994), the court concluded that *Ad Hoc* only applies to calculation of FMV in PP comparisons (where the distinction between direct and indirect expenses is most relevant).[8] 850 F.Supp. at 10. The *Torrington* court further stated that the *Ad Hoc* court "specifically noted that it was not ruling on whether the ITA has authority to adjust FMV for pre-sale inland freight pursuant to the [COS] provision." *Id.* The *Torrington* court, however, did not consider whether Commerce may make such a deduction for PP comparison purposes under the COS provision. In the present case, the Committee argues that the *Torrington* court misinterpreted the holding in *Ad Hoc* and that the COS provision is not applicable.

This court cannot accept so broad an interpretation of the Federal Circuit's holding in *Ad Hoc* as the Committee would have. As noted in *Torrington,* 850 F.Supp. at 10, the Federal Circuit in *Ad Hoc* stated that "[a]lthough intervenors urge that we affirm the Court of International Trade judgment under the 'circumstances of sale' provision, we decline the invitation. It is well settled that an agency's action may not be upheld on grounds other than those relied on by the agency." *Ad Hoc,* 13 F.3d at 401 n. 8 (citing

SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)). Thus, the *Ad Hoc* court did not address the applicability of the COS provision to home market transportation costs in the calculation of FMV.

Furthermore, to apply *Ad Hoc* more broadly, that is, to both ESP and PP COS adjustments and perhaps to post-sale transportation expenses, as full application of the *Ad Hoc* rationale might,[9] would disregard Commerce's longstanding practice of deducting home market transportation costs under the COS provision.[10] This is a practice to which Congress has apparently acquiesced.[11] If, despite prior practice and Congressional inaction, the *Ad Hoc* court had intended to prohibit Commerce from deducting any home market transportation costs in calculating FMV for both ESP and PP comparisons, it would have made this intent clear. Instead, the court discussed, without disapproval, Commerce's ESP–COS procedures where, as indicated, indirect expenses, such as most pre-sale transportation costs, are deductible from FMV to the extent of the USP level of expenses. *See Ad Hoc,* 13 F.3d at 400; 19 C.F.R. § 353.56(b)(2). Therefore, the *Ad Hoc* court's conclusion can only be read properly in the context of the narrow question before it, that is, without a determination as to whether they are directly related to sales, may pre-sale transportation costs be deducted from FMV in the context of PP compari-

8. As indicated, indirect sales expenses are deducted from FMV for ESP comparisons, but not for PP comparisons. *See supra* discussion pp. 860–861. While ESP transactions were present in the proceedings underlying the *Ad Hoc* litigation, the Court of Appeals indicated that ESP methodology was not at issue on appeal. *See Ad Hoc,* 13 F.3d at 399 n. 2 ("In this case, Commerce used the purchase price approach.").

9. As indicated, *see supra* p. 861, the *Ad Hoc* decision relied upon the provision for deduction of transportation costs from USP, and the lack of such language on the FMV side, *compare* 19 U.S.C. § 1677b(a)(1), (4) *with* 19 U.S.C. § 1677a(d)(2)(A) (1988), but the court notes there is also no language concerning post-sale transportation costs on the FMV side. *See Ad Hoc,* 13 F.3d at 399 n. 3, 401–02.

10. *See, e.g., Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof from the*

*Federal Republic of Germany,* 54 Fed.Reg. 18,-992, 19,046 (Dep't Comm.1989) (final determs. of less than fair value ("LTFV") sales); *Butadiene Acrylonitrile Copolymer Synthetic Rubber from Japan,* 53 Fed.Reg. 15,436, 15,438 (Dep't Comm. 1988) (final determ. of LTFV sales); *Color Television Receivers from Korea,* 53 Fed.Reg. 24,975, 24,988 (Dep't Comm.1988) (final).

11. Although Congress amended the antidumping statute in 1979, 1984 and 1988, no changes were made to the COS provision, at least arguably signalling Congressional approval of Commerce's application of the COS provision to deduct home market transportation costs in calculating FMV. *See Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969) (stating agency construction of statute should be given great weight, especially when "Congress has refused to alter the administrative construction").

sons. *Ad Hoc's* answer to that question is "No."

In other post-*Ad Hoc* cases treating pre-sale home market transportation expenses, where Commerce had not conducted a COS analysis, the court has remanded the case to Commerce with instructions to determine whether ITA had the statutory authority to deduct the transportation expenses from FMV in PP comparisons. *E.g., Torrington,* 850 F.Supp. at 10, 12; *Federal–Mogul Corp. v. United States,* Slip Op. 94–40, at 8, 1994 WL 88926 (Mar. 7, 1994); *Timken Co. v. United States,* Slip Op. 94–41, at 5–6, 1994 WL 88922 (Mar. 7, 1994). Commerce has now fully analyzed this issue and applied COS methodologies in the PP context following remand of *Ad Hoc.* The court agrees that the statute, as well as *Ad Hoc,* leaves Commerce free to apply its COS methodology to pre-sale transportation costs in the PP context. *See supra* discussion of 19 U.S.C. § 1677b, prior practice and legislative history.

The court now turns to the application of COS analysis to the facts of record here. In the present case, eleven of CEMEX's sales at issue are classified as ESP sales.[12] All parties have agreed from the outset that the pre-sale home market transportation costs may be deducted as indirect expenses under the COS provision for ESP sales comparisons (although the Committee also argues, somewhat inconsistently, that the holding in *Ad Hoc* now prevents this). *See* discussion *supra.*

For those sales classified as PP transactions,[13] the issue is whether the pre-sale home market transportation expenses are direct expenses, and thus may be deducted in calculation of FMV. CEMEX asserts that the pre-sale home market transportation expenses are tied directly to the PP sales at issue,[14] and are properly deducted from FMV under the COS provision. The regulations, however, do not provide any guidance in determining what constitutes "direct" expenses.[15] Furthermore, the case law to date has not specifically addressed deduction of pre-sale home market transportation expenses as direct or indirect expenses under the COS provision. On remand Commerce shall address this issue.[16]

In sum, as *Ad Hoc* held, Commerce does not have the "inherent authority" to deduct pre-sale home market transportation expenses in the calculation of FMV. Instead, the statute permits such expenses to be deducted as indirect expenses under the COS provision for ESP comparisons, subject to the ESP offset cap. For PP comparisons these expenses may be deducted from FMV

12. Initially, Commerce had contended that CEMEX misclassified 14 ESP sales as PP transactions. Commerce now acknowledges that three of the 14 U.S. sales at issue were correctly classified by CEMEX as PP sales. These three sales are recorded on invoice numbers CA–1588, CA–1590 and CA–1596. Commerce requests a remand to make the appropriate corrections. Def.'s Mem. Opp'n Def.–Int.'s Mot.J. Agency R. at 10 n. 10. CEMEX does not oppose Commerce's request.

13. *See supra* note 12.

14. CEMEX reported plant-by-plant freight factors on a peso per kilogram basis. CEMEX maintains that since all types of hydraulic cement are subject to the same freight rates from each plant, CEMEX's reported freight expenses are attributable solely to merchandise subject to the sales order, and can therefore be directly linked to the ESP sales at issue. Def.–Int.'s Mem. Opp'n Pls.' Mot.J. Agency R. at 26.

15. CEMEX's citation to the legislative history of amendments to the original antidumping statute in *Antidumping: Hearings on H.R. 6006 Before the Senate Comm. on Finance,* 85th Cong., 2d Sess. 19 (1958) (explanatory mem. of Treasury Dep't), does not offer further clarification. *See* Def.–Int.'s Mem. Opp'n Pls.' Mot.J. Agency R. at 27–28.

16. The court has considered whether pre-sale warehousing costs may fall under the COS provision. *See, e.g., Asahi Chem. Indus. v. United States,* 12 CIT 690, 693–94, 692 F.Supp. 1376, 1379 (1988) (finding pre-sale warehousing charges incurred in home market may merit COS adjustment); *NTN Bearing Corp. v. United States,* 14 CIT 623, 641, 747 F.Supp. 726, 741–42 (1990) (holding pre-sale warehousing costs may be directly related to sales under consideration and thus warrant COS adjustment). *But see LMI–La Metalli Industriale, S.p.A. v. United States,* 912 F.2d 455, 457–58 (Fed.Cir.1990) (affirming ITA determination that pre-sale warehousing costs were not attributable solely to home market sales, and thus not directly related).

under the COS provision if the expenses are determined to be directly related to the sales at issue. Therefore, the court remands this issue for Commerce to determine to what extent the pre-sale home market transportation costs at issue may be deducted as a COS adjustment in calculation of FMV.

### B. *VAT Adjustment*

The Committee challenges whether Commerce's treatment of the Mexican VAT in this case was appropriate. The Committee argues that the court should remand the issue to Commerce to adjust USP by the VAT amount that would have been collected on the merchandise if the sales were home market sales. Commerce concedes that in *Federal–Mogul Corp. v. United States,* 834 F.Supp. 1391, 1396 (Ct. Int'l Trade 1993), the court rejected the manner in which Commerce had been interpreting *Zenith Elecs. Corp. v. United States,* 988 F.2d 1573, 1582 n. 4 (Fed.Cir.1993), when making a VAT adjustment. Commerce thus agrees that the court should remand this case for VAT adjustment, as does CEMEX. The court further instructs Commerce that it shall apply its new VAT methodology as approved in *Torrington Co. v. United States,* 853 F.Supp. 446, 448–49 (Ct. Int'l Trade 1994).

### C. *Applicability of Adverse BIA to Reclassified ESP Sales*

CEMEX contests both Commerce's application of BIA for reclassified ESP sales and the specific rate chosen. CEMEX argues that the case should be remanded for Commerce to request from CEMEX indirect selling expense information on the reclassified ESP sales. Commerce maintains that because it did not have adequate information upon which to determine the appropriate adjustments on the ESP sales, it was justified

in using BIA as the basis for the deductions required by 19 U.S.C. § 1677a(e) (1988). The Committee supports Commerce's view.

Congress has mandated that Commerce "shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available." 19 U.S.C. § 1677e(c) (1988). Similarly, the regulations provide for the use of BIA when Commerce "(1) [d]oes not receive a complete, accurate and timely response to ... [a] request for factual information; or (2) [i]s unable to verify, within the time specified, the accuracy and completeness of the factual information submitted." 19 C.F.R. § 353.37(a) (1993). Commerce lacks subpoena power, but the BIA provision is a means of obtaining compliance with Commerce's requests for information. *See Rhone Poulenc, Inc. v. United States,* 899 F.2d 1185, 1191 (Fed.Cir.1990).

Commerce's initial questionnaire in the administrative review requested that CEMEX report its United States sales and identify each as a PP sale or an ESP transaction. The questionnaire clearly indicated, consistent with the definitions provided in 19 U.S.C. § 1677a(b)-(c), the distinction between PP sales and ESP sales.[17] Upon learning that CEMEX had misclassified 11 ESP sales as PP transactions,[18] Commerce requested that CEMEX submit documentation to verify the entry dates of the questioned sales.[19] Along with the verification information requested by Commerce, CEMEX proffered additional information that had not been requested. The additional information provided Commerce with data to calculate indirect selling expenses for the sales that CEMEX had misclassified. Commerce rejected the additional information and instead applied

---

**17.** The questionnaire defined PP sales as "[s]ales to an unrelated buyer for export to the United States, with dates prior to the date on which the merchandise was imported into the United States." *See* App.Pls.' Reply Br.Supp.Mot.J. Agency R. and Br. Resp. Issues Raised Def.–Int. App. E, at C–1. The questionnaire defined ESP sales as "[s]ales made to an unrelated buyer for the U.S. market after the date on which the merchandise . was imported into the United States." *Id.* App. E, at C–2.

**18.** *See supra* note 12.

**19.** Commerce requested that CEMEX submit "any U.S. Customs documentation (e.g., Form 7501) which would indicate the date of entry" for each of the 14 sales at issue. *See* Conf.App. Def.–Int.'s Mem.Opp'n Pls.' Mot.J. Agency R.App. N (Commerce Apr. 15, 1993 letter to CEMEX).

BIA in the calculation of USP for the reclassified ESP sales.

CEMEX claims that the use of BIA was improper in this case for three reasons: a/ Commerce had no basis to reclassify any of the reported PP sales; b/ Commerce was required to request or give CEMEX the opportunity to provide the necessary indirect selling expense information; and c/ Commerce should have used "neutral" information rather than adverse BIA.

■ This court cannot accept CEMEX's argument that Commerce had no basis to reclassify the reported PP sales. CEMEX contends that Commerce's reclassification of the 11 sales was improper because the date of sale of the reclassified sales preceded their date of entry. CEMEX points to an earlier ruling made by Commerce in the original investigation stating that Commerce "consider[ed] the date of shipment to be the date of sale." *Gray Portland Cement and Clinker from Mexico,* 55 Fed.Reg. 29,244, 29,248 (final determ. of LTFV sales). CEMEX argues that it relied upon this classification of the "date of sale" when preparing its response to Commerce's questionnaire. CEMEX, however, overlooked Commerce's explicit definitions of PP sales and ESP sales contained in the questionnaire. Moreover, CEMEX misinterprets Commerce's ruling in the original investigation, because Commerce limited its "date of sale" holding to a small class of United States sales, i.e., sales made pursuant to a long-term contract, and a subsequent "letter agreement." *Id.* There is no evidence in the record showing that the sales at issue fall within this narrow class of United States sales.

■ CEMEX's second argument, that Commerce was required to request or give CEMEX the opportunity to provide the necessary information, also fails. As indicated, CEMEX asserts that Commerce inappropriately resorted to BIA and that the case should be remanded directing Commerce to request indirect selling expense data from CEMEX. CEMEX insists that only a refusal to comply with an information request justifies a resort to BIA. The court finds CEMEX's reliance upon *Olympic Adhesives Inc. v. United States,* 899 F.2d 1565 (Fed.Cir.

1990), *Daewoo Elecs. Co. v. United States,* 13 CIT 253, 712 F.Supp. 931 (1989), *aff'd in part and rev'd in part,* 6 F.3d 1511 (Fed.Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2672, 129 L.Ed.2d 808 (1994), and *Outokumpu Copper Rolled Prods. AB v. United States,* 829 F.Supp. 1371 (Ct.Int'l Trade 1993), is misplaced.

In *Olympic Adhesives,* Commerce had resorted to BIA because it claimed that respondent through its questionnaire response failed to provide information that "unequivocally negated or established the allegation that the home market sales were fictitious." 899 F.2d at 1574. There the court held that Commerce "may not properly conclude that resort to the best information rule is justified in circumstances where a questionnaire is sent and completely answered, just because the ITA concludes that the answers do not definitely resolve the overall issue presented." *Id.*

Further, in *Daewoo,* Commerce had not "follow[ed] the regular procedure of providing a questionnaire containing the appropriate instructions needed to compile the required information." 13 CIT at 265, 712 F.Supp. at 944. Commerce chose not to use some of the calculations incorrectly reported by the respondent. *Id.* Thus the *Daewoo* court concluded that Commerce had improperly resorted to BIA because the inaccurate responses were a result of "[Commerce's] own failure to provide instructions as to the methods of compiling the information." *Id.* at 266, 712 F.Supp. at 945.

Lastly, Commerce's questionnaire in *Outokumpu* provided: " '[B]e aware that if we do not agree with your preference for comparison, at a later date we will have to request information on cost differences for items we select for comparison.' " 829 F.Supp. at 1375–76. The *Outokumpu* respondents provided in their questionnaire several model matches between merchandise sold in the United States and in the home market, and included difference-in-merchandise data for their reported comparisons only. *Id.* at 1376. Petitioners claimed that Commerce erred when it failed to use BIA for missing difference-in-merchandise data. Commerce, how-

ever, had never requested further information on the comparisons it selected. *Id.* The *Outokumpu* court thus found that Commerce's decision not to resort to BIA was appropriate. *Id.* at 1377.

In the present case, unlike the facts in *Olympic Adhesives, Daewoo* and *Outokumpu,* the data was not missing because Commerce had failed to make an appropriate request for it, but rather because CEMEX misclassified the data in its submission. Thus, Commerce acted reasonably in resorting to BIA for the missing data. Further, CEMEX's submission of the correct indirect selling expense data to Commerce was untimely—after verification and two weeks before the final results were issued—thus preventing Commerce from verifying the information. Pursuant to 19 C.F.R. § 353.37(a), Commerce was justified in rejecting the data submitted untimely and in resorting to BIA. *See, e.g., Mantex, Inc. v. United States,* 841 F.Supp. 1290, 1309–10 (Ct. Int'l Trade 1993); *Chinsung Indus. Co. v. United States,* 13 CIT 103, 105–07, 705 F.Supp. 598, 600–02 (1989).

■ The final argument to be addressed is whether Commerce should have used "neutral" information because Commerce classified CEMEX as "essentially . . . a cooperative respondent." 58 Fed.Reg. at 25,808. CEMEX maintains that if the court determines Commerce's use of BIA was proper, Commerce should have used "neutral" information.[20] Commerce used as BIA the weighted-average of all of the ESP adjustments for the ESP sales properly reported by CEMEX.

CEMEX misunderstands Commerce's BIA methodology as well as the general purpose of the BIA provision. Commerce applies either "partial BIA" or "total BIA."[21] Regardless of the type of BIA used, Commerce does not apply a "neutral" figure as BIA except in very unusual situations for which a respondent should not be penalized.[22] The purpose of the BIA provision is to induce respondents to provide Commerce with timely, complete and accurate information so that Commerce can determine dumping margins as accurately as possible. *Rhone Poulenc,* 899 F.2d at 1190–91. To accept CEMEX's contention that "neutral" information should have been applied in this case where CEMEX misclassified its sales would undermine the purpose of the BIA provision, and would allow a respondent to pick and choose among its data, a practice not permitted.

Although Commerce's application of adverse BIA in this case was appropriate, Commerce requests that the court remand the case for correction of selection of adverse BIA. Commerce asserts that the use as BIA of the weighted-average of all the ESP adjustments to ESP sales properly reported by CEMEX resulted in Commerce, (a) not using actual expense data timely reported by CEMEX for certain ESP adjustments for these ESP sales, and (b) including certain adjust-

20. CEMEX claims that Commerce should have used the weighted average of the indirect selling expenses reported by CEMEX as BIA. *See* Def.–Int.'s Mem. Opp'n Pls.' Mot.J. Agency R. at 38.

21. Under Commerce's BIA methodology, there are two general types of BIA: "total BIA" and "partial BIA." For "total BIA" the respondent's entire dumping margin is calculated upon the basis of BIA. Commerce uses "total BIA" for a respondent whose reporting or verification failure is so extensive as to make its entire response unreliable. Commerce's choice of a particular BIA rate is dependent upon whether the respondent is deemed to have been "cooperative" or "uncooperative." Commerce will use the highest possible BIA rate for an "uncooperative" respondent.

Commerce applies "partial BIA" when a respondent's submitted information is deficient in limited respects, yet is still reliable in most other respects. In a "partial BIA" situation, Com-

merce alleges it does not consider the level of cooperation of the respondent.

22. In a "partial BIA" situation the only instance in which BIA is not adverse is when there is an inadvertent gap in the record, *e.g., Replacement Parts for Self–Propelled Bituminous Paving Equipment from Canada,* 58 Fed.Reg. 15,481, 15,482–83 (Dep't Comm.1993) (final), when only a minor or insignificant adjustment is involved, *e.g., Brass Sheet and Strip from West Germany,* 55 Fed.Reg. 28,264, 28,265 (Dep't Comm.1990) (prelim. results), or when the missing data is beyond the control of the respondent. *See, e.g., Holmes Prods. Corp. v. United States,* 16 CIT 628, 629–31, 795 F.Supp. 1205, 1206–07 (1992) (requiring ITA to use respondent's data because respondent was found by ITA to be in substantial compliance and could not control conduct of uncooperative affiliate).

ments that could not have been applicable to these ESP sales. *See* Def.'s Mem. Opp'n Def.–Int.'s Mot.J. Agency R. at 19. CEMEX argues that Commerce: a/ disregarded verified price adjustment information pertaining to the reclassified sales, and b/ included unrelated expenses in BIA applied to the reclassified sales. *See* Def.–Int.'s Mem.Supp. Points Raised Def.–Int.'s Compl. at 41, 43. As the request made by Commerce to correct its selection of BIA is consistent with CEMEX's claim, the court remands this issue for Commerce to reconsider what corrections are appropriate.

### D. *Application of Adverse BIA for Added Materials Costs*

CEMEX reasserts the argument that because Commerce labeled CEMEX a "cooperative" respondent, Commerce should have used "neutral" information instead of adverse BIA for added materials costs. CEMEX further contends that if adverse BIA was to be used, Commerce should have used as BIA the highest individually reported added materials costs *per cubic yard of concrete,* while applying the specific conversion factor [23] reported by CEMEX on a product-by-product basis, to arrive at the added materials costs *per cement ton.* Specifically, CEMEX argues that Commerce should be required to use CEMEX's data that was later verified, and should limit its use of BIA to the one component of the added materials costs that CEMEX did not report.[24] CEMEX maintains that this measure "would reasonably reflect the actual costs of added materials." Def.–Int.'s Mem. Supp. Points Raised Def.–Int.'s Compl. at 47. Commerce argues that it was within its discretion in selecting "partial BIA" to apply the highest information reported by CEMEX for other products in place of the information not reported.

In calculating the value-added adjustment to ESP for CEMEX's further manufactured sales through Sunward Materials, Commerce did not accept any of the average added materials costs CEMEX supplied. Commerce instead used BIA for the necessary added materials cost adjustments. For the Phoenix division, BIA was based upon the highest individually calculated added materials cost per cement ton, for any product made at the division for which CEMEX had properly reported product-specific costs. For the Tucson Division, Commerce followed the same approach. 58 Fed.Reg. at 25,809.

As previously discussed, in the "partial BIA" context, "neutral" BIA is applied only to a respondent who has substantially complied and there is also an inadvertent or unavoidable gap in the record, or when a minor or insignificant adjustment is involved. *See supra* note 22. In the present case, CEMEX failed to provide actual added materials cost data and the adjustments at issue were significant.

CEMEX asserts that, at least, Commerce should have used the highest available data on costs per yard of concrete, multiplied by the product-specific conversion factor supplied. Commerce instead filled in missing added materials cost data in "per cement ton" terms by taking CEMEX's highest end result for added materials costs, yielding a higher BIA rate than would result from the approach advocated by CEMEX. Commerce has previously applied this method to other products. *See, e.g., Pressure Sensitive Plastic Tape from Italy,* 54 Fed.Reg. 13,091, 13,-092 (Dep't Comm.1989) (final).

■ CEMEX asserts, however, that here this results in a margin of over 1000% for the

---

**23.** All concrete costs and sales are recorded in CEMEX's accounting records in terms of dollars *per cubic yard of concrete.* All cement sales by CEMEX and the adjustments and factors in CEMEX's computer tape are reported in terms of dollars *per ton of cement.* CEMEX's questionnaire response to Commerce included a column in the computer tape, "BLKCONVE," that provided the conversion factor necessary to convert information reported on the basis of dollars per cubic yard of concrete to a dollars per ton of cement basis, for each product.

**24.** For approximately 18% of CEMEX's further manufactured concrete products manufactured by its U.S. subsidiary, Sunward Materials, Inc. (through its Phoenix and Tucson divisions), all elements except direct materials were fully costed. For these products, CEMEX reported an average added materials cost and a specific conversion factor.

products involved because of the wide variation in the amount of cement used in particular products. While Commerce may use "adverse" BIA here, the result of Commerce's selection may be needlessly distortive. Accordingly, this matter will be remanded to determine if the method recommended by CEMEX would result in a sufficiently adverse, but non-distortive, BIA choice.[25]

### Conclusion

Commerce's methodology for determining FMV in this case is not in accordance with law. Thus, the court remands the case for Commerce to consider CEMEX's claimed deductions for its pre-sale home market transportation costs under the COS provision. Also, Commerce's methodology for determining the VAT adjustment in this case is not in accordance with law. Accordingly, the court remands the case directing Commerce to apply its new VAT adjustment methodology. Commerce's decision to use adverse BIA for the reclassified sales and added materials costs is supported by substantial evidence in the record and is otherwise in accordance with law, but Commerce shall reconsider its selection of particular BIA data for both the reclassified sales and added materials costs.

Remand results are due within forty-five days. Objections are due twenty days thereafter. Responses may be filed twelve days later.

25. CEMEX suggests that verified total material cost information proves that the BIA chosen was unduly distorted. On remand, ITA may wish to refer to such data as a check on its selection.