AD HOC COMMITTEE OF AZ-NM-TX-FL PRODUCERS OF GRAY PORTLAND CEMENT AND NATIONAL CEMENT CO. OF CALIFORNIA, PLAINTIFFS *v.* UNITED STATES, DEFENDANT, AND CEMEX, S.A., DEFENDANT-INTERVENOR

Consolidated Court No. 93-05-00273

(Dated May 15, 1995)

*King & Spalding (Joseph W. Dorn, Michael P. Mabile* and *Gregory C. Dorris)* for plaintiffs.

*Frank W. Hunger,* Assistant Attorney General, *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, United States Department of Justice *(John S. Groat), Duane W. Layton,* Senior Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

*Manatt, Phelps & Phillips (Irwin P. Altschuler, David R. Amerine, Ronald M. Wisla* and *Claudia G. Salzberg)* for defendant-intervenor.

## OPINION

RESTANI, *Judge:* This matter is before the court following a remand order. *See Ad Hoc Comm. of AZ-NM-TX-FL Producers of Gray Portland Cement v. United States,* 865 F. Supp. 857, 867 (Ct. Int'l Trade 1994) *("Ad Hoc I").* The court ordered the International Trade Administration of the United States Department of Commerce ("Commerce") to (1) reconsider its selection of particular best information available ("BIA") data for reclassified sales and added materials costs, (2) apply its new value-added tax ("VAT") adjustment methodology, and (3) consider CEMEX, S.A.'s ("CEMEX") claimed deductions for its pre-sale home market transportation costs under the circumstances of sales ("COS") provision. CEMEX challenges Commerce's *Final Results of Redetermination Pursuant to Court Remand ("Remand Results")* dated January 5, 1995.[1]

A. *Applicability of Adverse BIA to Reclassified ESP Sales:*

In *Ad Hoc I,* Commerce requested remand to correct its selection of BIA, asserting that

> use as BIA of the weighted-average of all the ESP adjustments to ESP sales properly reported by CEMEX resulted in Commerce, (a) not using actual expense data timely reported by CEMEX for certain ESP adjustments for these ESP sales, and (b) including certain adjustments that could not have been applicable to these ESP sales.

865 F. Supp. at 865–66. On remand, Commerce used the actual expense data for adjustments to the reclassified ESP sales and made no ESP adjustments other than those applicable to those sales. *Remand Results* at 7. In addition, Commerce used as BIA the highest amount reported for indirect selling expenses, exclusive of further-manufacturing expenses, incurred on CEMEX's ESP transactions. *Id.*

As the court has found Commerce's application of adverse BIA to CEMEX to be appropriate, *Ad Hoc I,* 865 F. Supp. at 865, CEMEX's reassertion of arguments raised in *Ad Hoc I* are rejected. The court further rejects CEMEX's contention that Commerce's selection of BIA should have been made based upon geographical considerations. As CEMEX has not proven any unusual distortive effects of the selection, the court finds no error with Commerce's selection of BIA based on sales occurring outside of the regions in which the reclassified ESP sales were made. Commerce has broad discretion in determining the appropriate adverse BIA. *Krupp Stahl A.G. v. United States,* 822 F. Supp. 789, 792–93 (Ct. Int'l Trade 1993). Finding no other error, the court sustains Commerce's application of adverse BIA for CEMEX's indirect selling expenses for the reclassified ESP sales.[2]

---

[1] CEMEX does not challenge Commerce's reconsideration of its selection of BIA for added materials costs. CEMEX also does not contest Commerce's reclassification of three exporter's sales price ("ESP") transactions as purchase price ("PP") transactions. Thus, Commerce's redetermination as to these issues is sustained.

[2] CEMEX also contests Commerce's "use of a per ton amount for indirect selling expenses, instead of a percentage average for all other indirects." Def. Int.'s Comments on Commerce's Final Remand Results at 9. As this argument was not raised in the underlying administrative review, the court will not permit CEMEX to raise this argument now.

B. *Deduction of Pre-Sale Home Market Transportation Expenses:*

As to its second challenge, CEMEX contests Commerce's treatment of pre-sale home market transportation expenses as indirect expenses. In *Ad Hoc I,* the court approved of the deduction of pre-sale home market transportation expenses under the COS provision in ESP comparisons, subject to the ESP offset cap, and in PP comparisons if the expenses were shown to be directly related to sales in the home market. 865 F. Supp. at 862–63. Thus, the court remanded this issue to Commerce to determine to what extent CEMEX's pre-sale home market transportation expenses may be deducted as a COS adjustment in the calculation of foreign market value ("FMV"). *Id.* at 863.

In the final remand results, Commerce stated that

> [i]n order to determine whether pre-sale movement expenses are direct, [Commerce] examines the respondent's pre-sale warehousing expenses, since the pre-sale movement charges incurred in positioning the merchandise at the warehouse are, for analytical purposes, inextricably linked to pre-sale warehousing expenses. If pre-sale warehousing is an indirect expense, then, in the absence of contrary evidence, pre-sale movement expenses should also be treated as an indirect expense.

*Remand Results* at 3. Commerce determined that CEMEX had not incurred any pre-sale warehousing expenses as a direct selling expense. In support of this finding, Commerce relied upon CEMEX's failure to claim any warehousing expenses as a direct selling expense under the COS provision, and CEMEX's statement, in its December 23, 1991 questionnaire response, that it incurred no post-sale warehousing expenses.[3] *Id.* Consequently, Commerce treated "the expense of transporting the cement to the warehouse * * * as an indirect expense." *Id.*

CEMEX contends that classifying pre-sale transportation expenses on the basis of the direct or indirect nature of pre-sale warehousing expenses is erroneous. CEMEX asserts that in order to be entitled to a COS adjustment for a direct sales expense, all it need establish is that the expense is related to sales of the subject merchandise in the home market. CEMEX does not recognize a category of non-allowable indirect sales expenses (for PP comparisons).

Commerce, on the other hand, attempts to make distinctions between direct and indirect sales expenses.[4] First, it is more likely that post-sales expenses will be considered direct, as actual sales can be identified once they exist. Second, Commerce does recognize certain pre-sale expenses as direct, but such circumstances are limited. For freight and warehouse expenses, those circumstances usually involve products channeled or

---

[3] In addition, CEMEX listed "warehousing expenses of cement plants" in its calculation of indirect selling expenses in its April 30, 1992 supplemental questionnaire response. *See* Apps. to Pls.' Br. Resp. Def.-Int's. Comments on Commerce's Remand Results, App. J at 24, App. K.

[4] *See* 19 C.F.R. § 353.56(a)(1) (1993). That regulation provides, in pertinent part, that

> [i]n calculating [FMV], [Commerce] will make a reasonable allowance for a *bona fide* difference in the circumstances of the sales compared * * *. In general, [Commerce] will limit allowances to those circumstances which bear a direct relationship to the sales compared.

*Id.*

customized for certain buyers.[5] Commerce concluded that CEMEX did not establish that pre-sale warehousing expenses were a direct expense, thus, in the absence of evidence to the contrary, expenses incurred in "transporting the cement to the warehouse [was] also not shown to be a direct expense." *See Ad Hoc Comm. of AZ-NM-TX-FL Producers of Gray Portland Cement v. United States,* Slip Op. 94–152, at 3 (Sept. 26, 1994); *accord Torrington Co. v. United States,* Slip Op. 94–168, at 7 (Oct. 21, 1994) (agreeing that in a PP comparison, "if the pre-sale warehousing expense is not shown to be a direct expense, then it follows that the pre-sale freight expense is also not shown to be a direct expense"). The court perceives no conflict with the statute or regulations in the application of this particular approach to this case.

As to procedure, CEMEX argues that it never had the opportunity to present evidence as to the direct/indirect nature of its warehousing expenses, despite repeated requests by CEMEX that Commerce permit submission of such data on remand. CEMEX admits that it could have claimed pre-sale warehousing expenses as a direct expense in the original review proceeding.[6] *See* Def.-Int.'s Comments on Commerce's Final Remand Results at 16. At that time, however, ex-factory to ex-factory comparisons were allowed by Commerce, so the indirect versus direct expense distinction was not generally material. Nevertheless, it became very material on remand.

In view of the classification of warehouse expenses as indirect in questionnaire responses in the original review proceeding, and the court's approval of the linking of transportation and warehousing expenses, CEMEX had the burden to support unlinking the expenses or classification of warehousing expenses as direct. On remand, Commerce accepted all of CEMEX's submissions, over petitioners' objections. Further, CEMEX submitted a coherent explanation of its views. This is not an issue on which a record was not made. Although Commerce did not ask for quantification of warehousing expenses, there is no evidence that it would not accept and consider any explanation CEMEX wished to submit that would have made quantification relevant.

As to substance, CEMEX contends that it submitted data supporting the conclusion that its pre-sale warehousing and transportation expenses were directly related to the sales of cement in the home market. Specifically, in its October 19 and December 5, 1994 submissions, CEMEX argued that, under its cement distribution system, warehous-

---

[5] *See Stainless Steel Bar from Italy,* 59 Fed. Reg. 66,921, 66,928 (Dep't Comm. 1994) (final determ. of less than fair value ("LTFV") sales) (allowing COS adjustment where pre-sale warehousing expenses incurred for designated amount of subject merchandise with certain specifications for particular customers); *Polyethylene Terephthalate Film, Sheet, and Strip from Japan,* 56 Fed. Reg. 16,300, 16,303 (Dep't Comm. 1991) (final determ. of LTFV sales) (allowing COS adjustment for pre-sale warehousing expenses found to be directly related to sales on basis that expenses incurred and reported for specific products sold to specific customers).

[6] With respect to COS adjustments, Commerce's original questionnaire provided that: "To the extent the circumstances of sale, and thereby selling expenses, vary in connection with your domestic and U.S. sales, some adjustment may be appropriate." Def.'s Resp. Def.-Int.'s Comments on Commerce's Final Remand Results at 25 n.9. According to CEMEX, at the time of filing of its December 23, 1991 questionnaire response, Commerce allowed a COS adjustment for pre-sale warehousing expenses in only one instance. *See supra* note 5; *Polyethylene Terephthalate Film,* 56 Fed. Reg. at 16,303.

ing of cement was dedicated to serving the demands of particular customers, thus pre-sale movement expenses could be directly tied to sales to those customers. *See* Admin. Pub. Doc. 2, at 24–26; Doc. 15, at 29–32. Commerce, however, was not persuaded by CEMEX's only proffered example in support of its argument.

CEMEX asserted that all sales during the period of Type II cement from its Guadalajara terminal were made to a single customer, with the exception of certain cement sold in June 1991. *See* Admin. Conf. Doc. 1, at 22. This, according to CEMEX, sufficiently establishes a direct relationship to sales of the subject merchandise. In the final results, however, Commerce determined that the Guadalajara "terminal acted as a distribution terminal from which regional orders were filled." *Remand Results* at 24. This is an acceptable view of the record evidence. Thus, the court finds that it was not error to reject CEMEX's attempt to treat all transportation expenses for shipment to certain customers as one continuous direct expense, despite pre-sale stops at warehouses.

Finally, in its submissions to Commerce, CEMEX failed to provide data segregating pre-sale and post-sale freight expenses for home market sales from its Atotonilco plant via the Vallejo terminal to the ultimate customer. As a result, Commerce treated these expenses as indirect selling expenses. CEMEX contends that, pursuant to its request on remand, Commerce should have used other reported data as a proxy for the missing data. The court disagrees. As CEMEX failed to explain why the missing expense data could not be provided, the court finds that Commerce was justified in treating these expenses an indirect expenses.

## C. *VAT Adjustment:*

In *Ad Hoc I,* 865 F. Supp. at 863, the court directed Commerce to apply its new VAT methodology as approved in *Torrington Co. v. United States,* 853 F. Supp. 446, 448–49 (Ct. Int'l Trade 1994). *Accord, e.g., Independent Radionic Workers v. United States,* 862 F. Supp. 422, 426 (Ct. Int'l Trade 1994) (approving Commerce's new VAT methodology). Commerce followed the court's direction. CEMEX now requests that the court reconsider its approval of Commerce's new methodology. The court declines to do so, as CEMEX did not address this issue in a timely manner.

Specifically, CEMEX contests the secondary adjustment in the new VAT methodology where Commerce "adjust[s] * * * the foreign market tax and the USP tax adjustment" to account for expenses deducted in calculating FMV and USP. *See Remand Results* at 4–5. CEMEX's challenges, however, to Commerce's application of its new VAT methodology were not raised until the remand proceedings in this case. CEMEX also never raised objection to the court's direction for Commerce to apply, on

remand, the *Torrington*-approved VAT methodology.[7] On the contrary, in a submission to Commerce on remand, CEMEX made an affirmative statement of support for the *Torrington*-approved methodology. *See* Admin. Pub. Doc. 2, at 6 ("[Commerce] should * * * apply its new *[Torrington*-approved VAT] methodology in accordance with the Court's instructions."). Thus, the court will not here consider for the first time general challenges to that methodology.

As to the specific application of *Torrington* to these facts, CEMEX had an obligation, before it supported *Torrington* or acquiesced in it, to examine application of the new VAT methodology to its product if it wanted to claim an exception from the methodology for this case. CEMEX's attempts to challenge the new VAT methodology now are untimely. In any case, the alleged odd effects created by the new VAT methodology are limited, even for CEMEX.

CEMEX further contends that Commerce should have used a weighted-average VAT rate, rather than a flat 15 percent VAT rate. According to CEMEX, during the period of review, the applicable VAT rate was either 15 percent or 6 percent. In the final remand results, Commerce elected to use the 15 percent VAT rate "since this rate applies to almost all home market destinations."[8] *Remand Results* at 13–14. The court orders recalculation to account for the 6 percent transactions.

D. *Correction of Computer Errors:*

CEMEX requests that the court remand Commerce's remand determination for correction of inadvertent computer programming errors with regard to profit and the ESP offset cap. As these errors existed prior to the court's remand order, CEMEX's claims are rejected.

CEMEX additionally argues that a new error resulted from Commerce's failure to re-run PP margin calculations after correction of errors to the ESP program. Commerce does not oppose correction of this error. Thus, the court remands this issue to Commerce for recalculation.

CONCLUSION

Commerce's remand determination is sustained as to selection of BIA for CEMEX's indirect expenses for the reclassified ESP sales. Commerce's treatment of pre-sale transportation expenses as indirect expenses is also sustained. Commerce is directed to recalculate CEMEX's VAT adjustment to account for CEMEX's lower VAT percentage transactions. Commerce is further directed to recalculate CEMEX's PP margin calculations.

---

[7] At oral argument prior to remand, the court indicated it would direct Commerce to apply its new VAT methodology as used in the *Avesta* cases and the cases decided by the judge in *Torrington*. *See Avesta Sheffield, Inc. v. United States*, Slip Op. 94–53 (Mar. 31, 1994), *remand determ. aff'd*, Slip Op. 94–99 (June 14, 1994); *Torrington*, 853 F. Supp. at 448–49. All parties apparently understood that the VAT methodology was the one described in *Torrington*, which was decided the previous May.

[8] On remand, petitioners requested that the 15 percent rate or the weighted-average VAT rate be applied. *Remand Results* at 13.

Remand results are due within 30 days hereof. The parties will be deemed to have no objections to the recalculations unless the objections are filed within 5 days of filing of the remand results.