**TOYOTA MOTOR SALES, U.S.A., INC., Plaintiff,**

v.

**UNITED STATES, Defendant,**

and

Nacco Materials Handling Group, Inc., Independent Lift Truck Builders Union, International Association of Machinists and Aerospace Workers, International Union, Allied Industrial Workers of America (AFL–CIO), United Shop and Service Employees, Defendant–Intervenors.

Slip Op. 96–95.

Court No. 94–02–00106.

United States Court of International Trade.

June 14, 1996.

Dorsey & Whitney, Washington, DC (John B. Rehm, Munford Page Hall, II, and L. Daniel Mullaney), for plaintiff Toyota Motor Sales, U.S.A., Inc.

Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Civil Division, Commercial Litigation Branch, United States Department of Justice (Michael S. Kane), Priya Alagiri, Attorney–Advisor, United States Department of Commerce, Washington, DC, for defendant.

Collier, Shannon, Rill & Scott, Washington, DC (Paul C. Rosenthal, Mary T. Staley, and David C. Smith, Jr.), for defendant-intervenors.

CARMAN, Judge:

Plaintiff Toyota Motor Sales, U.S.A., Inc. ("plaintiff" or "TMS") has moved for judgment upon the agency record to contest certain aspects of the United States Department of Commerce's ("Commerce" or "Department") *Certain Internal–Combustion Industrial Forklift Trucks From Japan,* 59 Fed. Reg. 1374 (Dep't Comm.1994) (final results) (*Final Results* ). The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) (1988).

BACKGROUND

On January 10, 1994, Commerce published the final results of its June 1, 1989, through May 31, 1990, administrative review of an antidumping duty order on certain internal-combustion, industrial forklift trucks from Japan. *See Final Results,* 59 Fed.Reg. at 1374.[1] This review covered, in part, sales made by Toyota Motor Corporation (Toyota). *Id.* at 1375.[2]

Plaintiff requests this Court remand the *Final Results* with respect to eight issues. Plaintiff categorizes three challenged issues as substantive: (1) use of an internal interest rate to calculate imputed credit expense; (2) deduction of certain indirect selling expenses from home market price; and (3) imputation of 27 days of credit expense to purchase price sales. Plaintiff categorizes four challenged issues as ministerial and noncontroversial: (1) calculation of West Coast ocean freight expense; (2) calculation of a marine insurance deduction; (3) calculation of co-op

advertising expenses; and (4) calculation of credit expense for purchase price transactions. Plaintiff categorizes the remaining challenged issue as a controversial ministerial issue. That issue pertains to calculation of credit revenue and expense. Commerce opposes a remand only on the issue of the deduction of indirect selling expenses from home market price. Defendant–Intervenors NACCO Materials Handling Group, Inc., Independent Lift Truck Builders Union, International Association of Machinists and Aerospace Workers, International Union, Allied Industrial Workers of America (AFL–CIO), and United Shop and Service Employees (collectively "NACCO" or "defendant-intervenors") consent to a remand on plaintiff's ministerial non-controversial issues and on one aspect of the issue of the calculation of credit revenue and expenses, but oppose a remand on the remaining issues.

STANDARD OF REVIEW

The appropriate standard for the Court's review of a final determination by Commerce is whether the agency's determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988) (current version at 19 U.S.C. § 1516a(b)(1)(B)(i) (1994)).

DISCUSSION

I. *Clerical Errors in the* Final Results

All parties agree a remand is warranted so that Commerce may correct several clerical errors in the *Final Results.* These errors are as follows: (1) improper calculation of West Coast ocean freight expense; (2) improper calculation of the marine insurance deduction; (3) improper calculation of the deduction for co-op advertising expenses;

---

**1.** For further description of the products at issue, see *Final Results,* 59 Fed.Reg. at 1374–75.

**2.** Plaintiff TMS is Toyota's U.S. selling division. *See Final Results,* 59 Fed.Reg. at 1378.

The Court notes that in its papers, defendant identifies "Toyota Motor Sales, Inc." as "Toyota." Defendant–Intervenors designate Toyota Motor Sales, U.S.A., Incorporated "Toyota," and also state that "Toyota Motor Sales, Inc." will be

referred to as "TMS." Plaintiff uses "plaintiff," "Toyota," and "TMS" as abbreviations for Toyota Motor Sales, U.S.A., Incorporated, and refers to Toyota Motor Corporation as "TMC." The *Federal Register* decision designates Toyota Motor Corporation "Toyota," and designates "Toyota Motor Sales" "TMS." As indicated in this opinion, *supra,* when not quoting a party, the Court's designations will mirror those used in the *Federal Register.*

and (4) improper calculation of imputed credit expenses for purchase price transactions.

Given the parties' descriptions of these errors in their briefs, the Court agrees these errors appear to be clerical errors appropriate for remand. Accordingly, this Court remands the *Final Results* to Commerce to correct these four clerical errors. *See Federal–Mogul Corp. v. United States*, 872 F.Supp. 1011, 1014 (CIT 1994) ("The Court has stated that 'fair and accurate determinations are fundamental to the proper administration of our dumping laws' and has recognized that 'courts have uniformly authorized the correction of any clerical errors which would affect the accuracy of a determination.' " [3]) (citations omitted).

## II. *Calculation of Credit Revenue and Expenses*

The issue plaintiff has characterized as a controversial ministerial error, miscalculation of credit revenue and expenses, actually consists of two challenges. Plaintiff explains that in the *Final Results,* Commerce decided to exclude from the antidumping calculations credit revenue earned and expense incurred in connection with sales of forklifts to end-users, or what plaintiff refers to as "retail financing." Commerce did, however, decide to include such revenue and expense related to sales to dealers, referred to as "wholesale financing." In so doing, plaintiff maintains, Commerce committed two errors resulting in "substantial excessive deductions to U.S. price,[4] with a consequent substantial increase in the calculation of antidumping

duties." (Mem. in Supp. of Pl.'s Mot. for J. Upon the Agency R. (Pl.'s Br.) at 27.)

First, plaintiff claims, through clerical and typographical programming errors, Commerce "did not correctly identify the universe of 'wholesale' financing for which credit revenue and expense was to be allowed." (*Id.* at 27–28.) Plaintiff further breaks down this alleged error in two. First, in line 177 of Commerce's Exporter's Sales Price (ESP) Computer Program, Commerce neglected to add an "FR" before "48." [5] Second, plaintiff argues the ESP Computer Program incorrectly assumed sales with "FR" sales terms were the only sales with wholesale financing. In fact, plaintiff explains, many transactions other than "FR" transactions involved wholesale and not retail financing. Plaintiff claims Commerce, however, inadvertently excluded the credit revenue from those other transactions.[6]

Both Commerce and defendant-intervenors do not oppose plaintiff's assertion that Commerce's failure to insert an "FR" before the "48" in line 177 of Commerce's ESP Computer Program was a ministerial error warranting remand. Accordingly, this Court remands this error to Commerce with instructions to insert an "FR" before the "48" in line 177 of Commerce's ESP Computer Program. *See Federal–Mogul,* 872 F.Supp. at 1014–15 (remanding to Commerce to correct inadvertent computer programming and ministerial errors).

As to plaintiff's claim that Commerce improperly disregarded certain transactions

---

**3.** *But see Hyster Co. v. United States,* 858 F.Supp. 202, 206 (CIT 1994) (refusing to permit additional remand for correction of alleged errors where plaintiffs presented new bases of error, were untimely under Commerce's regulations, did not provide the Court with a reason why their request for correction was untimely, and the proceeding was "already lengthy").

**4.** The Court notes that the Uruguay Round Agreements Act, Pub.L. No. 103–465, 108 Stat. 4809 (1994), amended the antidumping statutes in many respects. Because Commerce's review in this case took place before the amendments took effect, however, this case is governed by the prior statutory scheme.

**5.** According to plaintiff, "FR" denotes "fleet rental financing," one of three types of credit arrangements involved. The "48" indicates the

number of months defining the period of financing.

**6.** One explanation for this error, plaintiff suggests, is that in responding to Commerce's questionnaire, plaintiff had claimed that wholesale and retail financing should be treated identically, and therefore did not distinguish between the two. Although Commerce decided to treat the two types of transactions differently, plaintiff alleges, Commerce "never gave any hint until the Final Results that it would make such a distinction. Therefore, [Commerce] never gave Toyota a chance to specifically distinguish between 'retail' and 'wholesale' financing before it made its decision to include one and exclude the other." (Pl.'s Br. at 31.)

that were in fact wholesale financing transactions, however, a dispute exists. Commerce agrees with plaintiff that a remand is warranted, and explains that .

> as a result of programming errors, the final results did not effectuate Commerce's intent of only including in the United States price credit revenue and expenses incurred in connection with wholesale financing. A remand is, therefore, appropriate so that Commerce can correct these programming errors in order that United States price will only be adjusted to reflect credit revenue and expenses incurred with respect to those transactions that Commerce deems to have been "wholesale."

(Def.'s Resp. in Partial Opp'n to Pl.'s Mot. for J. Upon the Agency R. (Def.'s Resp.) at 13.) Defendant–Intervenors, however, dispute Commerce's response that Commerce's exclusion of interest income from certain transactions alleged to be wholesale was a mere programming error. Instead, they argue, plaintiff's incomplete response caused Commerce's action: "Given that the Department had no basis upon which to distinguish between retail and wholesale transactions for transactions other than those sold under the 'FR' plan, the Department was left with no alternative but to exclude interest income for all other sales." (NACCO *et al.*'s Reply to Def.'s Resp. in Partial Opp'n (NACCO's Reply) at 8.)

The Court notes that plaintiff admits it did not segregate retail from wholesale transactions in its responses to Commerce, but explains that, until petitioners argued for the distinction, Toyota had no reason to segregate. Plaintiff also argues Commerce adopted the distinction for the first time in the *Final Results*. Commerce does not shed much light on this situation, other than to explain to the Court that Commerce's intent was not effectuated and to request a remand to correct "these programming errors."

 It is not clear whether this situation resulted from "programming errors," as Commerce claims, or from Commerce's failure to request necessary information from Toyota. It appears the latter is more proba-

ble. Regardless, defendant-intervenors' claim that "the Department's actions were a direct result of Toyota's failure to distinguish between wholesale and retail transactions in its questionnaire response" does not seem reasonable. If Commerce did not determine until the *Final Results* that it would distinguish between wholesale and retail transactions, Toyota would not have known it had a duty to segregate the two types of transactions in its questionnaire responses in this case unless Commerce had asked Toyota to do so. Defendant–Intervenors do not invite the Court's attention to any question put to Toyota by Commerce that would have required such a response.

In light of the above, this Court will exercise its discretion and remand this issue to Commerce. *See, e.g., Serampore Indus. Pvt. Ltd. v. United States Dept. of Commerce,* 12 CIT 825, 834, 696 F.Supp. 665, 673 (1988) (exercising the Court's discretion to remand to Commerce to determine whether an error occurred in a computer input calculation because the action was already being remanded and because "[t]he Court is loathe to affirm a determination that might be based on a questionable record"); *Outokumpu Copper Rolled Prods. AB v. United States,* 17 CIT 848, 854, 829 F.Supp. 1371, 1376 (1993) (finding Commerce's determination not to rely on best information available was proper, in part because the information was not sought, and thus "plaintiffs neither refused nor were they unable to produce information requested in a timely manner and in the form required") (citation omitted). On remand, Commerce is to adjust its calculation of credit revenue and expense to account for those transactions involving wholesale financing, and if necessary, request additional information.

The second challenge stemming from what plaintiff has characterized as a controversial ministerial error, miscalculation of credit revenue and expenses, is Commerce's alleged failure to adjust Toyota Motor Credit Corporation's (TMCC) [7] credit expense and indirect selling expense corresponding to TMCC's credit revenue. As to TMCC's credit expense, plaintiff explains that although Commerce stated in the *Final Results* it would

---

**7.** TMCC is a finance company related to TMS.

*See Final Results,* 59 Fed.Reg. at 1378.

not account for TMCC's credit expense, Commerce mistakenly "*did* include TMCC's credit expenses as deductions from U.S. price for the 'retail' transactions for which credit revenue was disallowed." (Pl.'s Br. at 32 (discussing *Final Results,* 59 Fed.Reg. at 1379).)[8] To correct this error, plaintiff asks this Court to order Commerce that

> [f]or "retail" transactions, [Commerce] should ignore both the credit revenue and the credit expense reported by Toyota in its response to the questionnaire. [Commerce] should calculate instead a deduction for credit expense that corresponds to the "wholesale" part of the transaction. For transactions with payment terms of FP90, T30, T35, and T90, [Commerce] should impute a credit expense of 90 days, 30 days, 35 days, and 90 days, respectively.

(*Id.* at 34 (citation omitted).) As to TMCC's indirect selling expense, plaintiff argues Commerce mistakenly took TMCC's indirect selling expense into account in its calculation of U.S. price by adding a certain amount of retail credit revenue to indirect selling expense. Plaintiff maintains that a certain amount of the transactional credit revenue should be deducted for "retail" transactions.

On this aspect of plaintiff's challenge, dispute again exists. Commerce asks this Court for a remand, and simply states, without further explanation, that plaintiff "correctly points out that Commerce inadvertently failed to take into account TMCC's credit revenue. On remand, Commerce should be permitted to recalculate credit expenses taking this credit revenue into account." (Def.'s Resp. at 14 (citation omitted).) Defendant–Intervenors, however, oppose a remand. First, defendant-intervenors argue, Commerce improperly responds to plaintiff's argument concerning imputed credit expense: "Toyota was not contending that the Department failed to take into account TMCC's credit revenue. Toyota was claiming that the Department inadvertently included TMCC's credit *expense* in its calculations." (NACCO's Reply at 9.) In any event, defen-

dant-intervenors maintain Commerce's inclusion was neither accidental nor the result of programming errors. Instead, defendant-intervenors characterize the situation as one involving the use of best information available (BIA) resulting from plaintiff's failure to provide Commerce

> information on the *actual payment dates* to TMS for these transactions. Accordingly, the Department was unable to calculate Toyota's actual credit expense based on the information available to it and so was left with no alternative but to rely on the credit expenses originally reported by Toyota. By relying on Toyota's own information as the best information available to it to calculate this expense, the Department's actions were in accordance with law and supported by substantial evidence and so should be sustained.

(*Id.*) Second, as to plaintiff's argument Commerce should not have included expenses incurred by TMCC in Toyota's indirect selling expenses because Commerce rejected Toyota's claim for retail credit revenue, defendant-intervenors maintain Commerce does not discuss the argument, and thus does not indicate whether it believes a remand is necessary. Defendant–Intervenors oppose a remand on this aspect of the issue, and allege plaintiff has

> failed to acknowledge that the Department allowed Toyota's claim for credit revenue in wholesale transactions and that TMCC would have incurred expenses related to these wholesale transactions.

> So long as the Department allows an offset for credit revenue earned by TMCC, the Department must also include expenses incurred by TMCC related to the sales between TMS and the dealers. Omission of these expenses would unlawfully reduce the cost associated with sales by Toyota to its dealers. The Department's inclusion of these expenses was not

---

8. Plaintiff appears to suggest the errors were effected through Commerce's ESP Computer Program. (*See* Pl.'s Br. at 33 ("[Commerce's] ESP Program eliminated the gross credit revenue from U.S. price, but deducted the full amount of credit expense ... which was an imputed credit expense incurred by TMCC in financing the retail transaction throughout the period which includes the entire term of the retail contract.").)

a ministerial or programming error and so does not require correction.

(*Id.* at 10.)

The Court will exercise its discretion to order a remand on this issue as well. This issue somewhat resembles the previous issue. If Toyota did not know that Commerce would disallow its claims regarding the retail transactions until the *Final Results,* Toyota would have no reason to know it should make distinctions between wholesale and retail credit expense in correspondence with Commerce. The same applies to TMCC's indirect selling expenses. On remand, Commerce is to recalculate credit expense, credit revenue, and indirect selling expenses and explain its recalculations, and if necessary request additional information.

### III. Use of an Internal Interest Rate to Calculate Imputed Credit Expense

Plaintiff argues Commerce rejected plaintiff's actual financing cost and instead illegally used an internal interest rate to calculate the deduction from U.S. price for credit expenses, resulting in a substantial increase in antidumping duties. *See Final Results,* 59 Fed.Reg. at 1378 ("[I]n calculating credit expenses, the Department used the interest rate paid by TMS to [TMCC], its related finance company."). The internal interest rate paid between related Toyota entities cannot be used, plaintiff contends, because related party transactions cannot be used as the basis for U.S. price.[9] Moreover, plaintiff maintains, Commerce "never requested, and

Toyota never provided, any information on this 'internal' interest rate.... [T]he interest rate used by [Commerce], which is substantially higher than the actual interest rate, appears nowhere in the record...." (Pl.'s Br. at 12–13.) Accordingly, plaintiff asks this Court to remand this issue to Commerce with instructions "to correct the interest rate used to calculate credit expenses to reflect the actual cost of financing to Toyota from outside sources." (*Id.* at 17.) Commerce "agrees that a remand is appropriate to reconsider this issue," and asks for a remand "so that Commerce can reconsider its calculation of imputed credit expenses and, if necessary, request additional information regarding Toyota's actual financing costs." (Def.'s Resp. at 12.)

Defendant–Intervenors oppose a remand on this issue. First, defendant-intervenors argue that despite Commerce's consent to a remand on this issue, Commerce has failed to identify any error in the *Final Results* and does not otherwise provide justification for a remand. Mere government acquiescence, defendant-intervenors assert, does not warrant a remand, and "the Court must itself evaluate whether the record supports the Department's determination." (NACCO's Reply at 4.) Second, Commerce fully explained its reasons for using TMS' interest rate in the *Final Results.* The transaction under review consisted of the sale of forklift trucks by TMS to the first unrelated party. Based on established practice, Commerce

---

9. Plaintiff explains as follows:

> The starting point for U.S. price is the price to the first unrelated customer in the United States, and no related-party transactions can serve as U.S. price. 19 U.S.C. § 1677(13), 1677a (Supp.1994).
>
> For this reason, ... [Commerce] disregarded entirely the transaction between Toyota Motor Corporation ("TMC") in Japan and TMS, its wholly-owned U.S. subsidiary. The prices paid for the merchandise by TMS to TMC have no significance whatsoever for [Commerce's] analysis....
>
> ... In the cases that involve TMCC, it is TMCC that pays TMS for the imported forklift, and it is TMCC that receives the payment from the sale to the dealer. The price paid by the unrelated dealer to TMCC, the only unrelated-party transaction at issue, serves as the basis for U.S. price. The transaction between TMS

and TMCC, which is 100% owned by TMS, is disregarded, as is the transaction between TMC and TMS, which is 100% owned by TMC.

> ....
>
> Toyota calculated credit expense, like all other expenses, based on Toyota's actual cost of financing from unrelated sources....
>
> [Commerce], by contrast, has recalculated Toyota's credit expense, so that it is now supposedly based on an internal "expense" paid by TMS to TMCC, which is based on an intercompany rate, of unknown source....
>
> The effect ... is to deduct from U.S. price a significant portion of the profit that Toyota makes on its sales in the United States. Such a deduction is inappropriate, because one of the goals of the antidumping duty statute is to measure the extent to which Toyota's profit on U.S. sales is too low.

(Pl.'s Br. at 14–17 (citations omitted).)

"decided that the interest rate to be used should be based on TMS' experience, not TMCC." (NACCO et al.'s Opp'n to the Mot. of TMS for J. Upon the Agency R. (NACCO's Opp'n) at 7.)[10] According to defendant-intervenors, precedent of this Court clearly establishes that Commerce may use transactions between related parties under certain circumstances. (*See id.* at 8 (citing *Hyster Co. v. United States*, 848 F.Supp. 178, 187 (CIT 1994) and *LMI–La Metalli Industriale S.p.A. v. United States*, 8 Fed.Cir. (T) 157, 912 F.2d 455 (1990)).) Defendant–Intervenors explain: "The concern with using transactions between related parties is that transactions between related parties may understate the actual costs that are incurred and so would not reflect an arm's length transaction. If, however, the related party transaction reflects an arm's length transaction, then, such a transaction may be used." (*Id.* at 9 (citation omitted).) In this case, defendant-intervenors argue, the interest rate properly reflected an arm's length transaction.

■ In the *Final Results*, Commerce explained its position on this issue as follows:

**10.** According to defendant-intervenors, plaintiff informed Commerce that TMS had no short-term loans from unrelated sources, and argued that Commerce should use TMCC's short-term borrowing rate.

During this review, however, Toyota also reported that TMCC extended credit to TMS. Given that the Department wished to calculate TMS' credit expense, and not TMCC's credit expense, the Department properly relied on the internal corporate interest rate between TMS and TMCC, just as it had done in the prior administrative review.

(NACCO's Opp'n at 7 (citations omitted).)

**11.** In the administrative proceeding, Toyota had urged Commerce "to use the interest rate paid by TMCC on its short-term borrowings to calculate credit expenses for sales by TMS because the rate paid by TMCC reflects Toyota's actual cost of financing from unrelated sources." *Final Results*, 59 Fed.Reg. at 1378.

**12.** The Court notes that in oral argument on *NACCO Materials Handling Group, Inc. v. United States*, 896 F.Supp. 1248 (CIT 1995), a case involving the same parties and the same administrative review, Commerce informed this Court as follows:

The reason why the Department of Commerce has consented to a remand with respect to so many issues in this case *and the*

For the final results, we calculated U.S. credit expenses based on the experience of the sales division of Toyota. Because TMS is the selling division in the United States, not TMCC, we determined that the interest rate that should be used in the calculation of credit expense is one based on TMS' experience.[11] Because TMS does not have any short-term loans from unrelated sources, we have used the interest rate that TMCC charged TMS to reflect the credit expenses incurred on U.S. sales. This approach is consistent with the credit expense methodology used in the previous administrative review.

*Final Results*, 59 Fed.Reg. at 1378. Other than this short passage, Commerce does not explain why it used an internal interest rate or why this was permissible. Commerce's brief to this Court fails to illuminate the situation, or to even explain why the agency now agrees a remand is necessary. It is probable that Commerce's limited response is due to the state of the administrative record.[12] Accordingly, this Court will exercise its discretion to remand on this issue.[13]

*companion case* is you've carefully gone through the record, you can't figure out what's going on, because institutionally the people who are dealing with this case have left and it's very difficult to figure out what information is there, what the information that's there represents. . . . In order to be fair to both parties, Commerce should have considerable latitude on the remand requesting the information to articulate reasons. In many ways with respect to some of these issues it's almost as if we're starting from scratch because the record is so indecipherable.

*NACCO Materials Handling Group, Inc. v. United States*, No. 94–02–00096 (CIT Feb. 18, 1994) (transcript of oral argument at 104–05) (emphasis added).

**13.** The Court does so notwithstanding defendant-intervenors' argument that the Court must evaluate whether the record supports Commerce's determination. (*See* NACCO's Reply at 4 (referring to *Outokumpu Copper Rolled Prods. AB v. United States*, 17 CIT 848, 829 F.Supp. 1371 (1993) and *Avesta Sheffield v. United States*, 17 CIT 1212, 838 F.Supp. 608 (1993)).) The Court has found Commerce's explanation as set forth in the *Final Results* inadequate. This problem is compounded by Commerce's terse response to this issue in its brief to this Court, and Commerce's comments as to the state of the administrative rec-

On remand, Commerce is to reconsider its calculation of imputed credit expenses, explain the basis for its reconsideration and decision, and request additional information regarding Toyota's actual financing costs if necessary.

## IV. *Imputation of 27 Days of Credit Expense to Purchase Price Sales*

According to plaintiff, "[w]ith no supporting information on the record, [Commerce] incorrectly imputed 27 days of credit expense to purchase price sales, where, in fact, there was none," resulting in an excess deduction from purchase price and an overstatement of the antidumping duty. (Pl.'s Br. at 19.) Plaintiff explains Toyota reported in its questionnaire response that it did not incur credit expense on its purchase price transactions because it received payment immediately upon shipment. Commerce, plaintiff maintains, concurred with Toyota's conclusion through two verifications in the original investigation and first administrative review. Contrary to defendant-intervenors' accusations, plaintiff argues this was not a situation appropriate for use of BIA because Commerce did not request anything Toyota failed to provide. Plaintiff asserts that remarkably, however, Commerce used BIA in the *Final Results* and imputed as credit expense the average time between shipment from Japan and receipt by the customer.[14] Because "absolutely nothing" on the record supports this decision, plaintiff asks this Court to direct Commerce on remand to impute no credit expense to purchase price sales. (Pl.'s Br. at 21.) Commerce joins plaintiff's request for a remand because "there is insufficient evidence presently contained in the record to support a determination that 27 days of credit expenses were incurred with respect to purchase price sales." (Def.'s Resp. at 12.) Accordingly, Commerce asks this Court to allow Commerce to reconsider the issue on

remand and, if necessary, to request additional information relevant to the number of days credit expenses were incurred.

Defendant–Intervenors oppose a remand on this issue. First, defendant-intervenors argue the record does not support plaintiff's claim it incurred no credit expense:

In keeping with other recent cases in which the Department found that credit expenses were incurred when a respondent reported similar payment terms, and in light of evidence on the record in this review that Toyota incurred credit expenses even though Toyota denied these expenses, the Department had no alternative but to rely on the best information available to it to calculate this expense.

(NACCO's Opp'n at 13 (citation omitted).) Second, defendant-intervenors argue plaintiff's claim that the record does not support the *Final Results* on this issue misses the point because plaintiff, and not Commerce or petitioners, bears the burden of justifying claims for adjustment for both indirect and direct selling expenses. Thus, because facts of record indicated plaintiff did incur some credit expenses and because plaintiff failed to provide Commerce with information that would have permitted Commerce to calculate plaintiff's credit expenses for these sales, Commerce had no alternative but to rely on BIA. Finally, defendant-intervenors take issue with Commerce's request for a remand: "The government's statement appears to based [sic] on an unfamiliarity with the evidence on the record rather than based on any error committed by the agency." (NACCO's Reply at 5.)

▇ The Court notes that in the *Final Results*, Commerce stated as follows:

We agree with petitioners that reported credit expenses are incorrect. Although Toyota's [purchase price] sales are made on immediate payment terms (immediate

---

ord. *See Conoco, Inc. v. U.S. Foreign–Trade Zones Bd.*, 855 F.Supp. 1306, 1312 (CIT 1994) (explaining that the agency "and not the Court bears the burden of 'articulat[ing] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'") (citation omitted), *aff'd sub nom. Citgo Petroleum Corp. v. U.S. Foreign–Trade Zones Bd.*, 83 F.3d 397 (Fed.Cir.1996).

**14.** Plaintiff further explains Commerce "ostensibly justif[ies] this decision" in the *Final Results* by stating payment is immediate with respect to the date of delivery in the United States, but "the questionnaire clearly stated that payment is immediate upon shipment from Japan." (Pl.'s Br. at 21 (citing *Final Results*, 59 Fed.Reg. at 1380).)

with respect to the date of delivery in the United States), Toyota still incurs some credit expense on these transactions for the time between shipment and payment. An expense must therefore be imputed on [purchase price] sales for the time between shipment from Japan and payment. Because entry dates are unavailable, we used the average number of days between shipment and payment calculated by petitioners in their case brief. Petitioners' figure is based on data provided by Toyota. However, we have no information on the record indicating that Toyota incurred bank charge fees associated with the immediate payment [purchase price] sales and, thus, we cannot make an adjustment for such fees.

*Final Results,* 59 Fed.Reg. at 1380. Commerce offers the Court no explanation for its change in position other than its statement that the record contains insufficient information to support the *Final Results* on this issue.[15]

It is not clear from the *Final Results* why Commerce found "Toyota still incurs some credit expense on these transactions for the time between shipment and payment." *Final Results,* 59 Fed.Reg. at 1380. In light of the lack of clarity in the *Final Results,* Commerce's own request for a remand, and Commerce's statements to this Court concerning the state of the administrative record, this Court will exercise its discretion and remand this issue to Commerce. On remand, Commerce is to reconsider the number of days credit expenses were incurred on purchase price sales, if at all, and explain the basis for its decision. If necessary, Commerce may request additional information and make any and all calculations it deems necessary.

## V. *Deduction of Indirect Selling Expense from Home Market Price*

Plaintiff's argument on this issue is as follows. Commerce decided to deduct indirect selling expenses incurred by Toyota's manufacturing subsidiary, Toyota Automatic Loom Works, Ltd. (TAL), from U.S. and home market prices. In the preliminary results of this review, Commerce applied coefficients from the previous administrative review to prices from the current review. Although Toyota did not dispute Commerce's decision to use the previous review's coefficients, Toyota did, in its case brief, offer clerical corrections to the coefficient's correct use. Toyota also submitted data on TAL's indirect selling expenses from the previous review to assist Commerce in correctly implementing its decision to use the coefficients. Commerce, however, rejected the data as new information. Furthermore, although Toyota then offered to submit any information Commerce may need for its final results, Commerce made no request with respect to TAL's indirect selling expenses "because it believed, erroneously, that there was accurate information on the record." (Pl.'s Br. at 18 (citation omitted).) As Toyota stated in its case brief to Commerce, " 'If the Department deducts TAL indirect selling expenses from the U.S. price, it must, in fairness, deduct the same category of expenses from the home market price.' " (*Id.* at 19 (quoting Toyota's Case Brief to Commerce (Mar. 13, 1992) at 13 (further citation omitted), *reprinted in* Pl.'s App. Tab 6).) Commerce agreed in the *Final Results,* stating "[w]e have made a corresponding adjustment for TAL's [indirect selling expenses] incurred on [home market] sales." *Final Results,* 59 Fed.Reg. at 1377, *quoted in* Pl.'s Br. at 19. Commerce did not follow through, however, because "it lacked information on the record." (Pl.'s Br. at 19.)

Commerce, characterizing this issue as one of untimeliness, disputes plaintiff's claim and opposes a remand on this issue. According to Commerce, the deadline for submission of all factual information was January 28, 1992, the date of publication of the preliminary results. Commerce argues that although it requested Toyota report its home market indirect selling expenses, Toyota did not do so until after the deadline. "Under these circumstances," Commerce charges, "the

---

15. Commerce's response is so sparse that it is impossible to determine whether Commerce believes Toyota incurred no credit expense at all, or whether Commerce merely questions the figure of 27 days. (*See* Def.'s Resp. at 12–13.)

whole point of Toyota's untimely information was to persuade Commerce to use factual information that Toyota should have provided in response to Commerce's questionnaire." (Def.'s Resp. at 10.) Because Toyota does not fall into any of *"the exceptionally rare case[s]"* permitting acceptance of late data, Commerce claims it properly rejected Toyota's submission, and "concluded that TAL incurred no such expenses and simply determined an appropriate offset ... that did not include TAL home market indirect selling expenses." (*Id.* (citation omitted).)

Defendant–Intervenors side with Commerce, and characterize Commerce's actions as proper use of BIA. According to defendant-intervenors, in a supplemental questionnaire Commerce requested Toyota provide information on the allocated portion of TAL's indirect selling expenses. They contend Toyota refused to provide the information, instead stating:

> Adjustments a–d called for by this question are the subject of our responses to Questions 1, 3, 5 (with respect to indirect selling expenses only), and 7 in our letter to the Department, dated June 6, 1991. That letter explained how Toyota would make the adjustments in the first administrative review, if the Department finally decided that Toyota should do so. Toyota will therefore await the Department's decision before it proceeds to make the adjustments in the second administrative review.

(Public Record (P.R.) 74 at 13, *reprinted in* NACCO's App. 1, *quoted in* NACCO's Opp'n at 10.) Defendant–Intervenors argue Toyota's statement reveals "Toyota purposefully chose not to submit the information requested by the Department in this review, even though it had submitted the information in the first review." (NACCO's Opp'n at 10 (footnote omitted).) As to Toyota's submissions subsequent to the January 28, 1992, deadline, defendant-intervenors insist Commerce's regulations "specifically permit the Department to reject factual information submitted after the preliminary results are published." (*Id.* at 12.)

Plaintiff disputes these accounts by Commerce and defendant-intervenors of what transpired, and argues this is not an instance of untimely submission of data. Plaintiff argues that because TAL is a manufacturing and not a selling subsidiary, Toyota did not report indirect selling expenses from TAL in its initial questionnaire responses. Following verification in the first administrative review but prior to issuance of the second review's preliminary results, plaintiff explains, Commerce requested that Toyota

> describe how such expenses should be allocated, if the Department decided that they should be submitted and allocated. If the Department had requested TAL data, as it intended, Toyota would have submitted TAL's home market and U.S. indirect selling expenses, both for the first time, simultaneously. In fact, without any such request, and without any warning or notification, the Department simply deducted TAL's U.S. indirect selling expenses—taken from the first administrative review—in the *Preliminary Results* for the second administrative review at issue here, ignoring TAL's home market indirect selling expenses.

(TMS' Reply to Resp. Brs. of Def. and Def.–Intervenors at 21–22 (footnote omitted).) In response, plaintiff contends, it submitted in its case brief TAL home market indirect selling expense deduction from the first administrative review that corresponded to the U.S. indirect selling expenses for TAL deducted by Commerce. "This was the first chance that Toyota had to submit these data, and they were submitted solely in response to the Department's deduction of the U.S. portion of TAL's indirect selling expenses." (*Id.* at 22.) Plaintiff admits that in the preliminary results Commerce's "request was described in terms of U.S. indirect selling expenses incurred by TAL," but argues "the same information was needed for home market sales, since no expenses for either market had been reported." (*Id.* at 21 n. 7 (citation omitted).) Because Commerce "never requested any TAL data, but only asked how it would be allocated if requested, Toyota never submitted any TAL data for the second administrative review at issue, either for the U.S. market or for the home market." (*Id.*)

To resolve this controversy, the Court must determine whether Commerce requested the appropriate information from Toyota. *See Olympic Adhesives, Inc. v. United States,* 8 Fed.Cir. (T) 69, 79, 899 F.2d 1565, 1574 (1990) (explaining the BIA statute "clearly requires noncompliance with an information request before resort to the best information rule is justified, whether due to refusal or mere inability") (emphasis and citation omitted).[16] It appears Commerce did request Toyota:

Report here all expenses incurred during the period not reported elsewhere.
(1) Itemize each type of expense incurred.
(2) For each type of expense listed in (1), identify whether the expense is a selling, general/administrative, or other type of expense.
(3) For each type of expense listed in (1), state whether the expense is directly related to the sale of the merchandise.
(4) Demonstrate how you allocate these expenses to the merchandise under review. Submit all worksheets or calculations and identify the source of your data....

(P.R. 8 at B–11, *reprinted in* Def.'s App. 1.) Commerce also asked Toyota to "[a]llocate the portion of TAL indirect selling expenses incurred on behalf of *sales to the United States.*" (P.R. 66 at 2 (emphasis added), *reprinted in* Pl.'s App. Tab 11).

■ It is unclear, however, what Commerce was attempting to say, and what Commerce did, in the *Final Results* with respect to TAL's indirect selling expenses. *See Final Results,* 59 Fed.Reg. at 1376–77. As reported in the *Final Results,* Toyota contended "the Department should not rely on best information available ... to calculate ... certain indirect selling expenses (ISE) incurred in Japan on behalf of U.S. sales...." *Id.* at 1376. In response, Commerce stated, "We agree with Toyota.... For the final results, we did not request additional information for ... TAL ISE ...

because we calculated these expenses using information previously submitted by Toyota." *Id.* at 1377. In response to Toyota's arguments "that in calculating the TAL ISE incurred with respect to U.S. sales in Japan, the Department should have applied the ISE ratio to the TAL selling price, not to the much higher selling price of [TMS] in the United States," and that

as is evident from the information submitted and verified in the first review, TAL incurred the identical category of indirect selling expenses for [home market] sales as for U.S. sales.... [I]f the Department deducts TAL indirect selling expenses from U.S. price, it must also in fairness deduct the same category of expenses from [home market] price[,]

Commerce responded as follows:

We agree with Toyota that in the preliminary results we incorrectly calculated ISE incurred in Japan by TAL with respect to U.S. sales. For the final results, we have applied the indirect selling expense factor to the reported transfer price between TAL and TMS instead of to TMS' reported selling price in the United States. We have made a corresponding adjustment for TAL's ISE incurred on [home market] sales.

*Id.* The Court cannot discern from these statements what information Commerce received from Toyota, whether Commerce agreed in whole or in part with Toyota, what information, if any, Commerce deemed as late and unacceptable, and what Commerce used as BIA. Accordingly, this Court will again exercise its discretion and remand this issue to Commerce. *See Conoco, Inc.,* 855 F.Supp. at 1312 (explaining that the agency "and not the Court bears the burden of 'articulat[ing] a satisfactory explanation for its action including a rational connection between the facts found and the choice made'") (citation omitted); *Timken Co. v. United States,* 852 F.Supp. 1122, 1126 (CIT 1994) (remanding to Commerce because it was not

---

**16.** In *Olympic Adhesives,* the reviewing court made its statement in reference to 19 U.S.C. § 1677e(b) (1982). *See Olympic Adhesives,* 8 Fed.Cir. (T) at 69, 899 F.2d at 1567. In 1988, § 1677e(b) was redesignated as § 1677e(c), the

codification relevant to the determination at issue. *See* Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100–418, § 1331(1), 102 Stat. 1107, 1207 (1988).

clear to the Court "whether Commerce [had] received all the data it requested ... and, if it did not, whether Commerce [had] deemed the missing data unnecessary"). On remand, Commerce is to explain, and point out evidence on the record supporting, whether it requested TAL home market indirect selling expense information from Toyota, whether Toyota complied with this information request, and how Commerce ultimately treated TAL's indirect selling expenses. If Commerce is unable to point out evidence in the record supporting whether it requested TAL indirect selling expense information from Toyota, and whether Toyota complied with the information request, Commerce may secure additional information and upon securing that additional information pertaining to TAL's indirect selling expenses, Commerce shall make any and all necessary calculations.

## CONCLUSION

After considering the arguments of all parties, and after due deliberation, the Court holds that the final results of Commerce's administrative review in *Certain Internal–Combustion Industrial Forklift Trucks From Japan*, 59 Fed.Reg. 1374 (Dep't Comm.1994) (final results) is remanded to Commerce. On remand, Commerce is to correct the following errors: (1) the calculation of West Coast ocean freight expense; (2) the calculation of the marine insurance deduction; (3) the calculation of the deduction for co-op advertising expenses; (4) the calculation of imputed credit expenses for purchase price transactions; (5) Commerce will insert an "FR" before the "48" in line 177 of Commerce's ESP Computer Program. Also on remand, Commerce is to: (1) adjust its calculation of credit revenue and expense to account for those transactions involving wholesale financing, and if necessary, request additional information; (2) recalculate credit expense, credit revenue, and indirect selling expenses and explain its recalculations, and if necessary request additional information; (3) reconsider its calculation of imputed credit expenses, explain the basis for its reconsideration and decision, and request additional information regarding Toyota's actual financing costs if necessary; (4) reconsider the number of days credit expenses were in-

curred on purchase price sales, if at all, and explain the basis for its decision, and if necessary, Commerce may request additional information and make any and all calculations it deems necessary; (5) explain, and point out evidence on the record supporting, whether Commerce requested TAL home market indirect selling expense information from Toyota, whether Toyota complied with this information request, and how Commerce ultimately treated TAL's indirect selling expenses. If Commerce is unable to point out evidence in the record supporting whether it requested TAL indirect selling expense information from Toyota, and whether Toyota complied with the information request, Commerce may secure additional information and upon securing that additional information pertaining to TAL's indirect selling expenses, Commerce shall make any and all necessary calculations.

## ORDER

This case having been duly submitted for decision, and this Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision, it is hereby

**ORDERED** that the final results of Commerce's administrative review in *Certain Internal–Combustion Industrial Forklift Trucks From Japan*, 59 Fed.Reg. 1374 (Dep't Comm.1994) (final results) is remanded to Commerce; and it is further

**ORDERED** that on remand, Commerce is to correct the following errors: (1) the calculation of West Coast ocean freight expense; (2) the calculation of the marine insurance deduction; (3) the calculation of the deduction for co-op advertising expenses; (4) the calculation of imputed credit expenses for purchase price transactions; (5) Commerce will insert an "FR" before the "48" in line 177 of Commerce's ESP Computer Program. Also on remand, Commerce is to: (1) adjust its calculation of credit revenue and expense to account for those transactions involving wholesale financing, and if necessary, request additional information; (2) recalculate credit expense, credit revenue, and indirect selling expenses and explain its recalculations, and if necessary request additional information; (3) reconsider its calculation of imputed credit

expenses, explain the basis for its reconsideration and decision, and request additional information regarding Toyota's actual financing costs if necessary; (4) reconsider the number of days credit expenses were incurred on purchase price sales, if at all, and explain the basis for its decision, and if necessary, Commerce may request additional information and make any and all calculations it deems necessary; (5) explain, and point out evidence on the record supporting, whether Commerce requested TAL home market indirect selling expense information from Toyota, whether Toyota complied with this information request, and how Commerce ultimately treated TAL's indirect selling expenses. If Commerce is unable to point out evidence in the record supporting whether it requested TAL indirect selling expense information from Toyota, and whether Toyota complied with the information request, Commerce may secure additional information and upon securing that additional information pertaining to TAL's indirect selling expenses, Commerce shall make any and all necessary calculations; and it is further

**ORDERED** that Commerce's remand determination must be filed no later than July 3, 1996; and it is further

**ORDERED** that all initial comments on the remand determination must be filed no later than July 10, 1996, and all rebuttals to the comments must be filed no later than July 17, 1996. Parties may not file both initial comments and rebuttals. Defendant–Intervenors must file jointly. No comments or rebuttals shall exceed ten pages. No extensions of time or of page limitations will be granted.